WISCONICS ENGINEERING, INC., Niall C. Fitzpatrick, and John Zenner, Appellants (Defendants Below),

v.

Cecil C. FISHER, Appellee (Plaintiff Below).

No. 2–883A276.

Court of Appeals of Indiana, Second District.

July 31, 1984.

Rehearing Denied Sept. 27, 1984.

Grant F. Shipley, Livingston, Dildine, Haynie & Yoder, Fort Wayne, for appellants Wisconics Engineering, Inc. and Niall C. Fitzpatrick.

William N. Mills, Mills & Northrop, Huntington, for appellee.

SULLIVAN, Judge.

This is an interlocutory appeal, duly certified by the trial court, from summary judgment on Count I of a three-count complaint. The action concerns default on a promissory note executed in favor of Cecil C. Fisher, plaintiff below, by Wisconics Engineering, Inc., and guaranteed by Niall C. Fitzpatrick and John Zenner, defendants below, appellants herein. The trial court entered summary judgment on the note in favor of Fisher for the unpaid balance, prejudgment interest, attorney fees, and costs in the total sum of $389,666.90.

Appellants present the following issues:

(1) Whether the trial court committed procedural error in granting summary judgment in favor of Fisher;

(2) Whether the trial court erred in determining that appellants' affirmative defense of common law fraud was not supported with sufficient evidentiary matter to raise a factual issue regarding fraud, thereby avoiding summary judgment;

(3) Whether the trial court erred in determining that the Indiana Securities Act was inapplicable to the sale of stock in this case;

(4) Whether, under § 9–505 of the Uniform Commercial Code, Fisher retained the stock collateral in satisfaction of the note indebtedness, thereby discharging the obligors; [1]

(5) Whether, under § 3–606 of the Uniform Commercial Code, Fisher impaired the stock collateral, so as to release the guarantors from their obligation on the promissory note; [2] and

(6) Whether there is sufficient evidence to support the trial court's award of attorney fees in the amount of $1206.

We reverse except insofar as the trial court determined adversely to appellants upon their defense of common law fraud.

## FACTS

This litigation arises out of a transaction for the purchase of Fisher Engineering, Inc. (Fisher Engineering) of Huntington, Indiana. Fisher Engineering is in the business of manufacturing electrical components and circuitry for the United States Department of Defense. Until appellants purchased the company in July, 1980, Fisher Engineering had been a closely-held, family-run enterprise. Cecil C. Fisher (Fisher), the president and sole shareholder, had operated the business since 1950. The corporate financial statements which appear in the record for the years 1976 through 1979 and the monthly statements through June, 1980, show that the company was operated profitably during most of that time under Fisher's guidance and direction.

Early in 1980, appellants, Niall C. Fitzpatrick (Fitzpatrick) and John E. Zenner (Zenner), both of whom are experienced businessmen possessing considerable business credentials and financial resources, learned of Fisher Engineering through a business broker whom they employed. Subsequently, they contacted Fisher expressing an interest in purchasing his company. Fisher was interested in selling his business and negotiations ensued. After numerous communications between the parties during the spring and early summer of 1980, Fitzpatrick and Zenner reached an agreement with Fisher for the purchase of Fisher Engineering by means of a stock transaction wherein Fitzpatrick and Zenner, through their corporation, Wisconics Engineering, Inc. (Wisconics) would acquire 100% of the outstanding shares of Fisher Engineering stock. Wisconics, a Delaware corporation of which Fitzpatrick and Zenner are each 50% shareholders, was formed solely for the purpose of purchasing and holding the Fisher Engineering stock. The agreed purchase price for the Fisher Engineering shares was $750,000, to be financed by a $217,500 cash down payment with the remaining $532,500 to be paid in twelve equal installments of $44,375 plus interest of 11% per annum over a three year period. The installment debt on the stock is evidenced by a promissory note executed on July 28, 1980, in favor of Cecil C. Fisher, payee, by Wisconics. The note is personally guaranteed by Fitzpatrick and Zenner and is secured by a stock pledge to Fisher of all the outstanding shares of Fisher Engineering. The note contains, *inter alia*, a provision

---

1. Although appellants state this issue in terms of an "election of remedies", it is apparent from their argument and citation to authority that they raise the issue of whether the stock collateral was retained in satisfaction of the debt under UCC § 9–505.

2. In conjunction with Issues 4 and 5, appellants intersperse the contention that Fisher's actions constitute a failure of consideration. Inasmuch as this claim is not supported with authority nor argued cogently as an issue unto itself, we will not treat it as such.

entitling Fisher to declare the note in default if the net worth of Fisher Engineering fell below $300,000 or below the amount of any unpaid balance due on the note after June 30, 1981, and an acceleration clause wherein, upon any material breach, Fisher was entitled to declare all principal and interest owing on the note immediately due and payable.

On July 28, 1980, the day the transaction herein occurred, the parties executed, in addition to the note, a pledge agreement and an installment stock purchase agreement. Under the terms of the pledge agreement, Fisher was to hold the Fisher Engineering shares as security for the note indebtedness and was to receive any and all dividends declared on the stock. Wisconics was to retain voting rights to the shares except in the event of default upon the note. Upon completion of this transaction, Fisher resigned his position as President and director of Fisher Engineering. The officers' and directors' positions were then assumed by Fitzpatrick and Zenner.

On April 3, 1982, Wisconics defaulted on the note by failing to pay the installment then due or any installment due thereafter. There is no factual dispute among the parties concerning the fact of appellants' default on the note. However, the parties vehemently disagree on the events which occurred after Fitzpatrick and Zenner pur-

chased Fisher Engineering and which ultimately resulted in default. Herein lies the sources of appellants' affirmative defense of fraudulent misrepresentation.[3]

Fisher's version of events culminating in default differs considerably from that of appellants. According to Fisher, upon assuming control of the company, appellants set about to systematically loot it of all of its assets leaving it with a negative net worth when they finally did default on the note. Fisher claims that over half of the company's assets of some $606,000 on the date of sale were in government securities and other highly liquid assets. He claims that appellants misappropriated these assets and caused them to be transferred to Wisconics in exchange for non-interest bearing unsecured promissory notes, or to personal accounts in Continental Illinois Bank, or to John Zenner personally. The result of this alleged systematic misappropriation of funds and assets was to leave Fisher Engineering unable to meet its contract obligations, unable to pay its creditors and suppliers, unable to pay the utility bills, unable to insure the goods manufactured for the government as required by the government contracts, and finally, unable to pay the employees who remained at Fisher Engineering throughout the time in which these events occurred.

---

3. Appellants, in their brief before this court, claim that within days of their purchase of Fisher Engineering they began to encounter difficulties stemming from circumstances and facts which Fisher had misrepresented prior to the sale. Orders which were to be ready for shipment and delivery in August, September and October of 1980, respectively, were nowhere near completion, preventing the company from honoring its commitments and causing cash flow problems. Other contracts with the Department of Defense were not in fact "firm" as represented but were contingent upon further undertakings by Fisher Engineering. In addition, existing and newly negotiated contracts which were represented to have been bid in at a price calculated to produce a 12% profit were actually underbid and caused substantial losses. Appellants also claim that two-thirds of Fisher Engineering's testing equipment was subsequently found to be worthless and inoperative; that certain real estate values on property owned by the company were inflated; and that

certain "notes receivable" were actually uncollectible loans to Fisher's relatives. Finally, according to appellants, Fisher was to remain at Fisher Engineering as a salaried consultant assisting in the management of the daily business, but subsequent to the sale of the company, became uncooperative and refused to perform these services. Appellants maintain that these events and others contributed to their eventual default on the note.

However, with the exception of the Fitzpatrick affidavit, we must disregard any evidence in support of these allegations insofar as it relates to issues before us on appeal for the reason that such evidence was not before the trial court upon the motion for summary judgment. *See Weenig v. Wood* (2d Dist.1976) 169 Ind.App. 413, 349 N.E.2d 235, 242. Therefore, even though the record before us includes exhibits attached to appellants' Motion to Correct Error which, if considered, might substantiate appellants' allegations, they are not proper to our determination of the issues herein presented.

On April 13, 1982, Fisher notified appellants of their default under the terms of the note and of his decision to exercise the acceleration provision by declaring the unpaid balance of $310,625 immediately due and payable.

On July 23, 1982, after having learned of the company's insolvency, of the misappropriated cash transfers, and of a number of lawsuits against Fisher Engineering by its creditors, Fisher elected to vote the stock, which he held pursuant to the pledge agreement, to install himself as President and resume control of the corporation. After that date, Fitzpatrick and Zenner were denied access to their offices, the property, and the corporate records.

In the face of pending litigation and insolvency, Fisher placed the corporation in a Chapter 11 bankruptcy reorganization proceeding wherein Fisher Engineering continued to operate, under Fisher's control, as the newly created debtor-in-possession.

A supplemental record was filed with this court on January 12, 1984, while this case was pending on appeal, which informs us that the Fisher Engineering stock has been finally disposed of, relative to this action, at a judicial sale held on October 10, 1983, for a price of $34,737.22. The purchaser of the stock was Cecil Fisher who, as judgment creditor, takes the stock in partial satisfaction of his judgment.

On September 3, 1982, Fisher filed a motion for summary judgment on the note arguing that there were no material factual issues regarding his right to the unpaid balance. Appellants filed their response in opposition to the motion on October 15, 1982, along with Fitzpatrick's affidavit supporting their position. The trial court heard arguments on the motion and denied summary judgment on October 19, 1982. In November, Fisher obtained new counsel, and in December, filed a second motion for summary judgment on the Note. Fisher's Notice of Motion and accompanying memorandum addressed one issue only: Whether appellants were entitled to rely on Fisher's representations. Appellants again filed a response in opposition to the motion consisting of a memorandum, another affidavit by Fitzpatrick which is identical to the first, and a copy of Fisher Engineering's bankruptcy petition, presumably, to establish evidence of Fisher's alleged retention and impairment of the collateral. One court day prior to the summary judgment hearing—February 11, 1983—Fisher filed five additional affidavits in support of his motion and another memorandum of law raising the additional issue of whether the anti-fraud provision of the Indiana Securities Act was applicable to the facts of this case. The trial court conducted a hearing on the second motion on February 14, 1983, taking the motion under advisement, and, on March 16, 1983, the court entered summary judgment in favor of Fisher for the unpaid balance on the Note.

In its *Judgment and Order*, the trial court found:

"1. The defendant Niall C. Fitzpatrick delivered to the Plaintiff his resume, his business experience and financial status on May 30, 1980, showing considerable business experience. (Plaintiff's affidavit attached to Plaintiff's Second Motion for Summary Judgment filed December 7, 1982, paragraph 6 in Exhibit E).

2. The defendant John Zenner delivered to the plaintiff his resume, his business experience and financial status on July 2, 1980, showing considerable business experience. (Plaintiff's affidavit attached to Plaintiff's Second Motion for Summary Judgment filed December 7, 1982, paragraph 7 in Exhibit F).

3. Defendants Niall C. Fitzpatrick and John Zenner approached plaintiff for the purchase of Fisher Engineering, Inc. through their agent Thomas E. Sullivan commencing January 9, 1980, and continued to seek said sale to the date of purchase. (Plaintiff's Affidavit filed February 11, 1983, paragraphs 3, 9, 10, 11, 12, 5, and 7).

4. Defendants Niall C. Fitzpatrick and John Zenner acknowledged receipt of audited financial statements for the fiscal years ending 1975, 1976, 1977,

and 1978 and 1979 and additional financial information. (Request for Admissions paragraph 6, Installment Stock Purchase Agreement dated July 28, 1980, page 6, Article 6 'Financial Statements of Fisher.').

5. *The Affidavit of Niall C. Fitzpatrick filed on behalf of all defendant's [sic] on October 14, 1982, fails to bring forth specific facts showing a genuine issue for trial to prevent entry of a judgment against the defendants under Trial Rule 56(E) and Trial Rule 9(B).*

6. *Defendants have failed to file a pleadings [sic] or affidavit praying for a recision from July 28, 1980, through February 14, 1983, and that recision has therefore not been prayed for within a reasonable time.*

7. *Defendants took complete and absolute control of Fisher Engineering, Inc. on July 28, 1980, and retained control until July, 1982.*

8. *Plaintiff's sale of stock to defendants was not a sale of a security as defined in I.C. 23–2–1–1(k) under the economic reality test in that;*

 *(1) Defendants purchased all of the stock of Fisher Engineering, Inc. There was no sharing or pooling of funds.*

 *(3) Defendants took over complete management and control of Fisher Engineering, Inc. so that no profits or losses could be derived from the entrepreneurial or managerial efforts of others including plaintiff.*

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that:

1. The law is with the plaintiff, Cecil C. Fisher and against the defendants, Wisconics Engineering, Inc. Niall C. Fitzpatrick and John Zenner.

2. The plaintiff be and he hereby is awarded a judgment against the defendants in the sum of $389,666.90.

3. Count II and Count III of plaintiff's Complaint be and the same hereby are not affected by this Order.

All of which is ordered this 16th day of March, 1983.

Dane Mann

Dane Mann, Judge

Circuit Court of Huntington County"

(Emphasis supplied.) Record at 1026–1028.

On July 12, 1983, the trial court ruled on appellants' Motion to Correct Errors by modifying the award of attorneys fees and denying the motion in all other respects.

## I.

### PROCEDURAL ERROR

Appellants allege several procedural errors relative to the trial court's granting of summary judgment. Restated and summarized, appellants assert:

(A) That the second motion for summary judgment should have been deemed automatically denied inasmuch as it was a repetitive motion and was not ruled upon within five days of the date of its filing pursuant to Trial Rule 53.3;

(B) That the trial court improperly considered the five additional affidavits submitted by Fisher one court day prior to the hearing on the motion for summary judgment;

(C) That the trial court improperly granted summary judgment on issues not contained in Fisher's Notice of Motion and accompanying memorandum of law; and,

(D) That the trial court committed error by refusing to consider the documents appended to appellants' Motion to Correct Error.

### (A)

*Repetitive Motions*

■ Appellants contend that Fisher's second motion for summary judgment was merely a reassertion of his previously denied motion and, as such, constitutes a repetitive motion subject to the provisions of Trial Rule 53.4, restated below:

"REPETITIVE MOTIONS AND MOTIONS TO RECONSIDER;

TIME FOR HOLDING UNDER ADVISEMENT:

AUTOMATIC DENIAL

(A) Repetitive motions and motions to reconsider ruling on a motion. No hearing shall be required upon a repetitive motion or upon motions to reconsider orders or rulings upon a motion. Such a motion by any party or the court or such action to reconsider by the court shall not delay the trial or any proceedings in the case, or extend the time for any further required or permitted action, motion, or proceedings under these rules.

(B) Effect of court's delay in ruling upon repetitive motion or motion to reconsider ruling on a motion. *Unless such a motion is ruled upon within five (5) days it shall be deemed denied,* and entry of service of notice of such denial shall not be required. This rule 53.3 does not apply to an original motion for judgment on the evidence under Rule 50 after the jury is discharged, to amend or make additional findings of fact under Rule 52(B), an original motion to correct errors under Rule 59, or for correction of relief from judgments under Rule 60 or to the original motions to the extent expressly permitted or expressly designated as extending time under these rules." (Emphasis supplied.)

Appellants claim that in the absence of a ruling on the motion within five days from the date of its filing, the motion was deemed to be automatically denied. Consequently, the trial court erred by granting the second motion more than three months after it was filed, rather than treating the motion as denied.

■ Appellants misapprehend the purpose of this rule. It is designed to prevent delay through the filing of repetitive mo-

tions. *Biggs v. Marsh* (3d Dist.1983) Ind. App., 446 N.E.2d 977, 981, *citing* 3 W. Harvey, *Indiana Practice,* T.R. 53.3 (1982 Supp. p. 91). As emphasized in *Biggs,* the trial court has inherent power to reconsider any of its previous rulings so long as the action remains *in fieri. McLaughlin v. American Oil Co.* (3d Dist.1979) 181 Ind. App. 356, 391 N.E.2d 864; *Indiana Suburban Sewers, Inc. v. Hanson* (3d Dist.1975) 166 Ind.App. 165, 334 N.E.2d 720. Therefore, no error resulted from the trial court's ruling by virtue of the expiration of the five day period of T.R. 53.3.

(B)

*Late-filed Affidavits*

■ One court day prior to the hearing on the motion for summary judgment, Fisher filed five additional affidavits in support of his motion. The trial court considered all five of these affidavits in making its ruling. Appellants argue that the late filing prevented them from opposing Fisher's additional affidavits with additional counter-affidavits, thus leaving them in the untenable position of seeking to controvert the additional affidavits in a post-judgment setting.

Appellants rely upon Trial Rule 6(D) which states, in pertinent part:

"When a motion is supported by affidavit, the affidavit *shall be served with the motion;* and, except as otherwise provided in Rule 59(D) [sic], opposing affidavits may be served not less than one [1] day before the hearing, unless the court permits them to be served at some other time." (Emphasis supplied.) [4]

Appellants maintain that the language, "affidavits shall be served with the motion," is mandatory with regard to the proponent of the motion, thus rendering additional affidavits improper.

Fisher responds that Trial Rule 56(E) permits the proponent of a motion, in the

---

**4.** The reference to Rule 59(D) stated in Trial Rule 6(D) has not been amended to conform with a repositioning of the provisions of Trial Rule 59. In 1979, subsection (D) of Trial Rule 59 was redesignated as subsection (G), and in 1980, subsection (G) became subsection (H). Thus, the reference in Trial Rule 6(D), accurately stated, is to the current provisions of Trial Rule 59(H).

trial court's discretion, to supplement the original affidavits with additional affidavits. Therefore, his additional affidavits were not improper. We agree.

■ Furthermore, upon closer examination of the facts, appellants' argument that the late-filed affidavits left them in the precarious position of seeking to controvert the affidavits after judgment was entered, must fail. The contested affidavits were filed on Friday, February 11, 1983. The hearing on the motion was conducted on Monday, February 14, 1983. The court did not enter judgment on the motion until one month later on March 16, 1983. The record contains no evidence that appellants objected to the late filing of Fisher's affidavits, nor that appellants sought a continuance on the hearing, nor that appellants sought leave to file additional counter-affidavits of their own after the hearing but before judgment. Indeed, the provisions of Trial Rule 56(F) in this instance availed appellants of just such rights. Moreover, even after judgment was entered against appellants, they did not file counter-affidavits until June 20, 1983. In such circumstance we do not find cause for reversal. "[A] party who neglects to avail himself of a valid objection to a proceeding and stands by or participates therein until an adverse result is reached must bear the consequences." *Kahf v. Charleston South Apartments* (2d Dist.1984) Ind.App., 461 N.E.2d 723, 728; *Enderle v. Sharman* (1st Dist.1981) Ind.App., 422 N.E.2d 686, 691. See also *Middelkamp v. Hanewich* (3d Dist.1977) 173 Ind.App. 571, 364 N.E.2d 1024, where appellant claimed that he was caught by surprise at the summary judgment hearing "by the 'barrage' of exhibits 'fired' into evidence" at the last minute. 364 N.E.2d at 1040. The court held that he could not complain on appeal since, at the hearing, he had been accorded reasonable opportunity and yet did not object to the additional evidence nor suggest that he had other evidence pertinent to the motion for summary judgment. *Id.*

(C)

*Trial Court's Treatment of Issues Not Raised in Fisher's Notice of Motion*

■ On December 7, 1982, Fisher filed his second motion for summary judgment on the promissory note. The notice thereof expressly reserved the right to seek damages upon other tort theories. The memorandum which accompanied the motion was addressed solely to whether Fitzpatrick and Zenner were entitled to rely upon any of Fisher's representations. Fisher filed an additional memorandum on February 14, 1983, the date of the hearing on the motion for summary judgment. This memorandum, insofar as pertinent, raised additional issues regarding the sufficiency of the facts set forth in Fitzpatrick's affidavit to state a defense of fraud and the applicability of the Indiana Securities Act to the transaction. The trial court ruled upon these issues in entering summary judgment in favor of Fisher.

Appellants urge that it was improper for the trial court to enter summary judgment upon issues not recited in the notice of the second motion for summary judgment and the memorandum of law which accompanied it. They advance *Caltram Equipment Co. Inc. v. Rowe* (3d Dist.1982) Ind. App., 441 N.E.2d 46, for the proposition that judgment may not be entered upon grounds not stated in the notice of motion. Appellants contend that because they were without notice of the additional grounds upon which Fisher would seek summary judgment at the hearing, they were not prepared to respond accordingly; therefore, the issues were improperly before the court at that stage.

*Caltram Equipment, supra,* does not support appellants' position nor does it stand for the proposition appellants assert. In that case, the defendant filed a notice and motion for dismissal of the civil cause of action against him. During the hearing on the motion, at which the plaintiff failed to appear, the defendant filed an affidavit in support of a motion to tax costs to the plaintiff for bringing baseless litigation, which the court ultimately awarded against

the plaintiff. The plaintiff appealed the award claiming that it was improper because he received no notice that the defendant would seek attorneys fees at the hearing on the motion to dismiss.

The court stated:

"It is established that the notice of motion must state the *relief* sought. This is so since one of the basic purposes of a notice of motion is to apprise the opposing party of the relief sought and the grounds therefore. The trial court was not empowered ... to grant ... every possible relief, but only such as was incidental to, and not entirely distinct from, that specifically asked." (Citations omitted) 441 N.E.2d at 48.

The court further stated that "[a] notice of motion may not be enlarged by either supporting affidavits or oral argument." *Id.*

In *Caltram,* the defendant sought one *type of relief,* i.e., dismissal, but later, without notice to the plaintiff, persuaded the court to grant, in addition, another *type of relief,* i.e., attorneys fees. Such is not the situation presented by the instant facts. Fisher's notice disclosed that he sought one type of relief—summary judgment. He was granted only the relief sought, of which appellants were fully notified. Nothing in *Caltram* precludes Fisher from asserting, without prior notice to Wiconics, various *grounds* upon which such relief might be granted.

In any event, appellants, unlike the plaintiff in *Caltram,* were present at the hearing on the motion for summary judgment and had opportunity to object to consideration of additional issues. As with regard to subissue (B) above, the alleged error is waived. *Kahf v. Charleston South Apartments, supra,* 461 N.E.2d 723; *Enderle v. Sharman, supra,* 422 N.E.2d 686.

5. Although Trial Rule 9(B) relates to the sufficiency of the pleadings to state with particularity a cause of action or defense of fraud, appellants' pleadings are not challenged. Thus, it may be inferred that all parties considered the

(D)

*The Trial Court's Refusal to Consider*

*Evidence Appended to Appellants'*

*Motion to Correct Error*

 Appellants contend that the trial court erred by refusing to consider additional affidavits and other documents appended to their motion to correct error, which, they assert, controverts evidence contained in the late-filed Fisher affidavits and which state with greater particularity the facts upon which their claim of fraud is predicated. Error may not be based upon evidence not before the trial court at the time of the summary judgment. *Kahf v. Charleston South Apartments, supra; Weenig v. Wood* (2d Dist.1976) 169 Ind. App. 413, 349 N.E.2d 235. Moreover, appellants' attempt to place evidence before the court by attaching the documents to the motion to correct error does not comply with rules regarding newly discovered evidence. *Kahf, supra; Hurst v. Board of Commissioners* (3d Dist.1983) Ind.App., 446 N.E.2d 347, 351 fn. 1. The trial court committed no error by its refusal to consider appellants' additional evidence; neither may we consider it on review.

II.

SUFFICIENCY OF AFFIDAVIT TO

DEMONSTRATE GENUINE ISSUE
AS TO FRAUD

The trial court determined that Wiconics, Fitzpatrick, and Zenner had failed to set forth specific facts regarding their affirmative defense of fraud sufficient to demonstrate a genuine issue. The court's ruling alluded to Trial Rule 56(E) and Trial Rule 9(B).[5] Appellants contend that this ruling was error, and urge, to the contrary, that they did set forth sufficient facts to demonstrate a genuine issue of fraud, thus

pleadings to have sufficiently averred a defense of fraud. The dispute goes to whether Fitzpatrick's affidavit states specific facts sufficient to show a factual issue of fraud for purposes of summary judgment.

precluding summary judgment under Trial Rule 56(E).

Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Indiana Rules of Procedure, Trial Rule 56(C). In this regard, the burden is upon the movant to establish the absence of a genuine issue of material fact. *Podgorny v. Great Central Ins. Co.* (3d Dist.1974) 160 Ind.App. 244, 311 N.E.2d 640. However, the burden of establishing the existence of a material affirmative defense in a summary judgment proceeding, as at trial, is on the defendant. *Henry B. Gilpin Co. v. Moxley* (4th Dist.1982) Ind.App., 434 N.E.2d 914. When a motion for summary judgment has been made and supported as required by Trial Rule 56(E), the adverse party may not rest on the mere allegations or denials of his pleadings but must respond, by affidavit or otherwise, to set forth specific facts showing that there is a genuine issue for trial. *Johnson v. Padilla* (2d Dist.1982) Ind.App., 433 N.E.2d 393; *Costello v. Mutual Hospital Insurance, Inc.* (4th Dist. 1982) Ind.App., 441 N.E.2d 506.

In response to Fisher's motion for summary judgment on the promissory note, appellants filed one affidavit in opposition—that of Niall Fitzpatrick. Fitzpatrick's affidavit states that the defendants were induced to enter into the transaction for the purchase of Fisher Engineering in reliance upon Fisher's "false and untrue" representations, upon which their affirmative defense of fraud is predicated. The sum and substance of Fisher's representations, as stated in Fitzpatrick's affidavit are:

(1) A representation that Fisher Engineering *"was doing a large and very profitable business* as a contractor with the United States Department of Defense."

(2) A representation that defense contracts then in the process of completion *"would result in a large profit margin."*

(3) A representation that newly negotiated defense contracts *"would result in a large profit margin."*

(4) A representation *"regarding the value"* of a farm owned by Fisher Engineering and the building which housed the company.

(5) A representation that the building which housed the company was in *"good physical condition."*

As to the falsity of the representations, Fitzpatrick's affidavit states that Fisher Engineering had not been doing a large and profitable business with the United States Government; that the defense contracts then in the process of completion resulted in a loss as the result of underbidding; that the newly negotiated defense contracts resulted in a loss as the result of underbidding; that the value of the farm and building were several thousand dollars less than the value represented; and that the building had a leaking roof and was in need of extensive repairs.

For reasons which follow, we hold that the trial court's determination, insofar as it addresses a defense of common law fraud, was correct.

At the outset we emphasize that in order to foreclose an adverse entry of summary judgment, where otherwise appropriate, the opponent of the motion must set forth *specific facts* showing a genuine material issue for trial. Absent assertion of specific facts by appellants, Fisher was entitled, as a matter of law, to judgment upon the note. It was therefore incumbent upon appellants to comply with the letter of T.R. 56(E) to show *specific facts* contravening Fisher's assertion such as would entitle them to litigate the common law fraud issue. The only evidence offered, as noted above, was Niall Fitzpatrick's affidavit and a copy of Fisher Engineering's bankruptcy petition.

Regarding the Fitzpatrick affidavit, we observe initially that the representations with which Fisher is charged are indefinite, imprecise, and general in nature. A representation that a business is "doing a large and profitable business" does not state with specificity the amount of profit a busi-

ness is making nor the volume of business from which that profit derives. Generally, such a statement could be understood to mean many different things to different people. Likewise, a statement that defense contracts "would result in a large profit margin" is subject to similar diverse and imprecise interpretations. Furthermore, a representation "regarding the value" of certain real estate where the value is not stated may not be considered any representation at all. These affidavit statements do not meet the requirements of Trial Rule 56(E) to state facts with sufficient specificity to show a genuine material factual issue. The asserted representations are unavailing to appellants on other grounds as well.

■ Generally, a fraudulent misrepresentation requires a statement of past or existing material fact upon which the party to whom it is made has a right to and does rely, resulting in his injury. *Merchants National Bank of Massilon, Ohio v. Nees* (1915) 62 Ind.App. 290, 110 N.E. 73. Moreover, a representation is not actionable nor sufficient as a defense unless it concerns facts which would deceive a reasonably prudent person into acting upon them. *American Building and Loan Ass'n. of Indiana v. Fowler* (1909) 46 Ind.App. 285, 88 N.E. 118. Fraud may not be predicated upon promises to be performed in the future or future events, *Balue v. Taylor* (1893) 136 Ind. 368, 36 N.E. 269, nor, as a general rule, do expressions of opinion constitute fraud. *Automobile Underwriters v. Rich* (1944) 222 Ind. 384, 53 N.E.2d 775. Representations as to value, standing alone, are generally regarded as opinion or "trade talk" and do not constitute fraud. *Culley v. Jones* (1905) 164 Ind. 168, 73 N.E. 94; *Kluge v. Ries* (1917) 66 Ind.App. 610, 117 N.E. 262; *Godwin v. DeMotte* (1917) 64 Ind.App. 394, 116 N.E. 17; *Voorhees v. Cragen* (1916) 61 Ind.App. 690, 112 N.E. 826.

■ Where representations regard the value, quality, or condition of real property, a purchaser has no right to rely upon the representations of the vendor if there is reasonable opportunity to examine the property and to judge its value and qualities for himself. *Shepherd v. Goben* (1895) 142 Ind. 318, 39 N.E. 506; *Cagney v. Cuson* (1881) 77 Ind. 494. As stated in 37 C.J.S. Fraud 334, § 57:

"Misrepresentations as to value cannot ordinarily constitute fraud because they are generally to be regarded as mere expressions of opinion or 'trader's talk' involving a matter of judgment and estimation as to which men may differ. It has been held that such representations may under certain circumstances be nonactionable even when made with intent to deceive and with knowledge of their falsity, and a fortiori they are not actionable where made in honest ignorance. Where the parties deal at arm's length with equal means of knowledge, it is obvious that there can be no redress for misrepresentations as to value, because in such a case the hearer should investigate and judge for himself. He has no right in such a case to rely on the speaker's representations as to value, and if he does so and suffers injury it is his own folly, for which the law will grant no relief, and this is especially true where the relation of the parties is antagonistic, or where the hearer has made an investigation before acting, or knows that the speaker is relying on information from another, or the matter is one of public record."

■ An analysis of the alleged representations in light of these general propositions of law, when coupled with the established facts, reveals that the representations fall short of a basis for actionable common law fraud on at least three grounds:

(A)

*Right of Reliance*

The record discloses that Fisher furnished Fitzpatrick and Zenner with Fisher Engineering's audited financial statements for the company's fiscal years 1975, 1976, 1977, 1978, and 1979. In addition, unaudited monthly financial statements for each succeeding month through June of 1980

were given. Fitzpatrick and Zenner visited the Fisher Engineering facility and talked with Fisher Engineering personnel on at least one occasion. There is no evidence which would support an inference that they were not given every reasonable opportunity to inspect the premises and investigate while there. Moreover, John Zenner, speaking for both himself and Fitzpatrick in an investment letter to Cecil Fisher stated:

"We further understand the speculative nature of the investment being made by us and the risk of loss related thereto. We represent that we are knowledgeable concerning finance, securities and investments and that we are assuming the business risks involved in buying our shareholding interests in your corporation, Fisher Engineering, Inc. We represent that we have the financial responsibility and suitable net worth to make this investment and bear the risks of financial loss of our investment should the business purposes and objectives of the corporation not succeed. In addition, payment for our shares of stock in this corporation is not of significant materiality when compared with our total financial capacity.

We acknowledge that you have, during our discussions and negotiations with you regarding this purchase, furnished us with such financial and other data relating to the company, its competition, its objective purposes and forecasts and the tax risks and ramifications involved which we considered necessary or advisable for us to form a decision concerning this investment and participation in the business purposes of Fisher Engineering, Inc.

We acknowledge that we have been furnished adequate opportunity prior to the purchase by us, our legal counsel or investment advisers, to ask questions of and to receive answers from you as well as officers of the company, its operation and financial condition. We consider ourselves fully informed and do not require further information or data concerning the corporation or its proposed business objectives and purposes as a prerequisite condition to our obligation for full payment of the shares subscribed for." Record at 164.

Although the parties met in person at least once before the transaction was consummated, they dealt generally through their attorneys and the broker whose services appellants employed. It may be aptly stated that their dealings were at "arm's length".

Finally, Fitzpatrick and Zenner are both men of considerable business expertise. To restate but a few of their credentials as presented to Fisher during the negotiation process, Fitzpatrick holds a Master of Business Administration degree from Columbia University and has instructed business courses in Columbia's School of Business. In addition, Fitzpatrick has held numerous corporate offices and directorships in various companies. Zenner is a mechanical engineer with additional education in business administration and marketing. He has done extensive business consulting, has founded at least three companies with multimillion dollar sales, has been president of at least one electronics firm and chairman of the board of another, has held directorships in at least four other corporations, and has been active in commercial and industrial real estate development.

It is inconceivable that two experienced and well-educated entrepreneurs contemplating the purchase of a going business concern for $750,000 would rely or should be entitled to rely upon a bald assertion by the owner of the business that his company was doing "a large and profitable" business, or that its production contracts "would result in a large profit margin." Fitzpatrick and Zenner most certainly possessed greater sophistication than their claim of reliance upon these vague representations would denote. They stood on equal footing with Fisher and had a duty to exercise ordinary prudence and diligence to ascertain the truth. *Fleetwood Corp. v. Mirich* (3d Dist.1980) Ind.App., 404 N.E.2d 38, 45. Ordinary prudence and diligence would demand, in the least, that they seek

specific financial and business data to verify the representations of profitability. Were they able to show specific financial data or specific government contracts containing false information which had been asserted as true, reliance might have been justified giving rise to actionable fraud. See *Jenkins v. Long* (1862) 19 Ind. 28, 29, in which the court held:

> "If the representation was that the profits of the business had been, and then were, fifteen hundred dollars a year, and the representation was relied on in making the purchase, and it was false, it may have been such an one as amounted to fraud; because it was a representation of fact, and not the expression of an opinion; whereas, had the representations been that the profits would amount, in future, to fifteen hundred dollars, it would not have been a fraud, because it would have been an expression of an opinion, and not the representation of an asserted existing fact."

Fitzpatrick and Zenner were given specific financial data concerning Fisher Engineering but have not specified false figures or data.[6] Instead, they chose to rely upon indefinite representations of profitability. If in fact they did rely upon the asserted representations, their reliance was misplaced. We must conclude, as a matter of law, that Fitzpatrick and Zenner, both of whom are experienced businessmen, who were given audited financial statements and "other data relating to the company, its competition, its objective purposes and forecasts and the tax risks and ramifications involved which [were] considered necessary or advisable ... to form a decision concerning [the] investment" had no right to rely upon Fisher's general assertion of profitability.

**(B)**

*Fact v. Opinion*

and

**(C)**

*Present or Existing Fact v. Future Event*

Fisher's representations fall short of actionable fraud for the additional reasons that they are more accurately characterized as statements of opinion rather than of fact, some of which relate to future expectations (i.e. future profits) rather than to facts existing at the time the representations were made. This conclusion finds support in *Harness v. Horne* (1898) 20 Ind. App. 134, 50 N.E. 395, wherein the seller of a business made certain representations to the purchasers regarding the *value* of the business and the *amount of profits* the purchasers could expect to realize from the business. The court held:

> "All the representations made were mere statements of opinion. The statements ... as to what might be realized in the future out of the business were mere conjectures in relation to a future result dependent upon unknown contingencies. The representation that the business was worth $10,000, though relating to the time of the making of the representation, was a statement of an opinion, and not the representation of a material existing fact." 50 N.E. at 397.

Although there are exceptions to the general rule that expressions of opinion do not constitute actionable fraud, *Automobile Underwriters v. Rich, supra,* 53 N.E.2d 775, appellants have not asserted an exception nor does the record before us[7] set forth facts which might come within an exception.

---

**6.** Appellants' brief does direct us to specific values placed upon certain Fisher Engineering property by Fisher in the bankruptcy petition before the U.S. Bankruptcy Court which, appellants assert, are several thousand dollars less than the values which were represented prior to the sale. However, as we have emphasized, appellants have not specified a *particular* represented value. Fitzpatrick's affidavit refers only to representations "regarding the value" of certain property. Moreover, the values in the bankruptcy petition represented property values two years after the date of sale and after the business and property, in the hands of Fitzpatrick and Zenner, had deteriorated considerably.

**7.** i.e., the record, excluding the materials contained in appellants' motion to correct error. See fn. 3, *supra*.

In sum, appellants have not set forth sufficient nor specific facts, as required by Trial Rule 56(E), to show a genuine material issue of common law fraud so as to entitle them to trial upon the issue. The ruling of the trial court on this issue, granting summary judgment in favor of Fisher, must be affirmed.

### III.

### APPLICABILITY OF THE ANTIFRAUD PROVISION OF THE INDIANA SECURITIES ACT

■ The trial court, applying the "economic reality" test, determined that the stock transaction herein was not a sale of a "security" as contemplated by Indiana Code 23-2-1-1(k), because:

"(1) Defendants purchased all of the stock of Fisher Engineering, Inc. There was no sharing or pooling of funds.

(3) Defendants took over complete management and control of Fisher Engineering, Inc. so that no profits or losses could be derived from the entrepreneurial or managerial efforts of others including plaintiff." (Record at 1028.)

The definitional section of the Indiana Securities Act, I.C. 23-2-1-1, defines "security" as follows:

"(k) *Security means* any note; *stock;* treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; commodity futures contract; option, put, call, privilege, or other right to purchase or sell a commodity futures contract; margin accounts for the purchase of commodities or commodity futures contracts; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant, option, or right to subscribe to or purchase, any of the foregoing." (Emphasis supplied.)

The practical consequence of the trial court's determination is to render the antifraud provision of the act, I.C. 23-2-1-12, inapplicable to the Fisher Engineering stock sale.[8] The antifraud provision states:

"PROHIBITED PRACTICES WITH RESPECT TO SALES AND PURCHASES. —It is unlawful for any person in connection with the offer, sale or purchase of any security either directly or indirectly,

(1) To employ any device, scheme or artifice to defraud, or

(2) To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading, or

(3) To engage in any act, practice or course of business which operates or

---

**8.** Securities fraud, under the antifraud provision of the Indiana Securities Act and under SEC Rule 10b-5, encompasses a broader range of prohibited conduct than does common law fraud. Thus, it is possible to bring an action for securities fraud where an action for common law fraud will not lie. Fraud in the sale of a security requires no reliance by the purchaser. *Arnold v. Dirrim* (3d Dist.1979) Ind.App., 398 N.E.2d 426. Moreover, securities fraud includes the omission of any material fact "necessary in order to make the statements made, in

light of the circumstances under which they are made, not misleading ..." I.C. 23-2-1-12(2). The central consideration in determining the materiality of an omission is whether a reasonable investor would attach importance to the information when deciding the course of his action. *Arnold v. Dirrim, supra.* Thus, Fisher's omission to state certain material facts, if proven, in connection with the sale of the stock, and thus the business, conceivably constitutes conduct which would bring him within the antifraud provision.

would operate as a fraud or deceit upon any person." Burns Code Ed., 1984 Repl.

The trial court's ruling in this matter is apparently predicated upon analogous federal securities cases—in particular, the leading United States Supreme Court case of *United Housing Foundation, Inc. v. Forman* (1975) 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 and the Seventh Circuit decision of *Canfield v. Rapp & Son, Inc.* (1981) 654 F.2d 459. In *Forman*,[9] the Court rejected the suggestion that a transaction evidenced by the sale of shares called "stock" must necessarily "be considered a security transaction simply because the statutory definition of security includes the words 'any ... stock.'" 421 U.S. at 848, 95 S.Ct. at 2058. The Court then formulated the "economic reality" test which "embodies the essential attributes that run through all the Court's decisions defining a security." 421 U.S. at 852, 95 S.Ct. at 2060. The "economic reality" test contains three elements. Under the Court's formulation, a true security transaction within the meaning of the 1934 Securities Act involves (1) an investment in a common venture, (2) premised upon a reasonable expectation of profits, (3) to be derived from the entrepreneurial or managerial efforts of others. *Id.*

In *Canfield v. Rapp & Son, Inc., supra,* the Seventh Circuit Court of Appeals applied *Forman's* "economic reality" test to a stock transaction involving the sale of the Twigg Corporation, an Indiana manufacturer which, like Fisher Engineering, was a defense contractor for the United States government. Twigg Corporation was owned by three shareholders who, together, sold all their shares, and thus, their business, to Rapp for $2,000,000. Sometime thereafter, Rapp brought suit against Canfield, the individual who previously held the largest number of Twigg Corporation shares, alleging that he had violated, *inter alia,* Rule 10b–5 of the Securities and Exchange Commission, the anti-fraud provision of the Indiana Securities Act, and that Canfield's conduct constituted common law fraud.

In applying the three-part analysis, the court concluded that Rapp could not bring suit under either federal or state securities law because the transaction lacked two of the three essential elements of a true securities transaction. The Court determined that Rapp had not invested in a common venture since he had purchased all of the Twigg stock, thus, there was no "sharing or pooling of funds," 654 F.2d at 464, *citing Frederiksen v. Poloway* (7th Cir.1981) 637 F.2d 1147, *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389. The transaction also failed to satisfy the third element, requiring that the profits be derived from the entrepreneurial efforts of others, because Rapp took over the management and control of the company. Given these two deficiencies, the Seventh Circuit affirmed the District Court's decision that the Twigg Corporation transaction did not involve the sale of a security under federal law or state law. Consequently, Rapp was precluded from bringing a cause of action under SEC Rule 10b–5 or the anti-fraud provision of the Indiana Securities Act. In this respect, the trial court's ruling in the instant case squares perfectly with the *Canfield* decision.

The Seventh Circuit's basis for concluding that Rapp's claim was barred under Indiana as well as federal securities law is the fact that Indiana's definition of "security" under the Indiana Securities Act is "functionally equivalent to the federal definitions. *American Fletcher Mortgage Co., Inc. v. U.S. Steel Credit Corp.,* 635 F.2d 1247, 1253 (7th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981)." 654 F.2d at 463, fn. 5. The Seventh Circuit, therefore, determined that it would not differentiate between the state and federal laws. *Id.* Herein lies the

---

**9.** The *Forman* case involved the purchase of shares of stock in a low income, non-profit housing cooperative. The Court held that the transaction was not a purchase of securities because the shares lacked the attributes commonly associated with stock and therefore were not "stock" within the meaning of section 3(a)(10) of the Securities Act of 1934.

heart of the problem. Both the *Canfield* court and the trial court in the instant case overlooked the one Indiana decision which, for the moment, is determinative of the issue under Indiana state law.

In *B & T Distributors, Inc. v. Riehle* (1977) 266 Ind. 646, 366 N.E.2d 178, the Indiana Supreme Court upheld the determination of the Court of Appeals, First District (1977) 359 N.E.2d 622 (*rev'd* on other grounds), that a stock transaction for the sale of a business was subject to the antifraud provisions of the Indiana Securities Act. It should be noted that the language of the state statute is virtually identical to that contained in the federal SEC Rule 10b–5.

*B & T Distributors* is factually similar to the case at bar in that the owner of B & T Distributors, Mr. Riehle, was approached by two enterprising businessmen in an effort to purchase his company. After lengthy negotiations in which each of the parties was represented by counsel, agreement was reached and a contract for the sale of the business, via a stock transaction, was executed wherein all the shares held by Riehle were transferred to the new owners, Kingery and Schilling, for $70,000. Later, Kingery and Schilling brought suit against Riehle under the antifraud provision of the Indiana Securities Act alleging misrepresentation of material facts and omission of other material facts regarding the stock and the business. Riehle argued that the state antifraud provision was inapplicable because the stock was not registered. The court of appeals concluded, and the Indiana Supreme Court affirmed that the sale of unregistered as well as registered stock was subject to the prohibitions contained in the antifraud provision:

> "As can be seen from the statutes cited above our legislature did not seek to prohibit deceptive practices only as they related transactions in *registered securities*. It would have been a simple matter for them to have so provided if desired. Rather, our legislature made it unlawful for the seller, of *any security* to engage in any of the prohibited practices describ-

ed in IC 1971 23–2–1–12 *supra*." (Emphasis original.) 359 N.E.2d at 624, *aff'd* in part, *rev'd* in part at 366 N.E.2d 178, 179.

Whether the transaction in question was in fact a sale of a "security" as contemplated in the Indiana Act was neither raised nor addressed. However, for the court to have determined that the antifraud provision of the Indiana Act was applicable to the sale of a business by means of a stock transaction, it necessarily must have determined the transaction to be the sale of a "security" within the meaning of I.C. 23–2–1–1(k). Therefore, we must conclude that, under present Indiana law, the sale of a business, structured in the form of a stock transaction wherein all outstanding shares are sold or transferred, is subject to the antifraud provisions of the Indiana Securities Act, I.C. 23–2–1–12.

In so holding, we acknowledge that whether a sale of 100% of the stock in a business is in fact the sale of a "security" or, in "economic reality", is the sale of a business and thus excepted from various state and federal securities laws is one of considerable current interest and controversy in the securities arena. *See, e.g.,* Seldin, *When Stock is Not a Security: The "Sale of Business" Doctrine Under the Federal Securities Laws,* 37 Bus.Law 637, 679 (1982); Coffey, *The Economic Realities of a "Security": Is There a More Meaningful Formula?,* 18 Case W.Res.L.Rev. 367, 412 (1967); Rapp, *Federal Securities Laws Should Protect Some Purchasers of All or Substantially All of a Corporation's Stock,* 32 Case W.Res.L.Rev. 595, 607 (1982); Thompson, *The Shrinking Definition of a Security: Why Purchasing All of a Company's Stock is not a Federal Security Transaction,* 57 N.Y.U.L.Rev. 225, 260–61 (1982). The federal circuit courts are split on the issue. Several courts adhere to the *Canfield* "sale of business" exception to the federal securities law, *see, e.g., Landreth Timber Co. v. Landreth* (9th Cir.1984) 731 F.2d 1348; *King v. Winkler* (11th Cir.1982) 673 F.2d 342; *Frederiksen v. Poloway* (7th Cir.1981) 637

F.2d 1147, *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389; *Chandler v. KEW, Inc.* (10th Cir.1977) 691 F.2d 443; *Barsy v. Verin* (N.D.Ill.1981) 508 F.Supp. 952, while other courts have chosen to reject the "sale of business" doctrine, favoring a more literal interpretation of the definition of "security" as inclusive, in fact, of "any ... stock." *See Daily v. Morgan* (5th Cir.1983) 701 F.2d 496; *Golden v. Garafalo* (2d Cir.1982) 678 F.2d 1139; *Coffin v. Polishing Machines, Inc.* (4th Cir.1979) 596 F.2d 1202, *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92; *Mifflin Energy Sources, Inc. v. Brooks* (W.D.Pa.1980) 501 F.Supp. 334; *Titsch Printing, Inc. v. Hastings* (D.Colo.1978) 456 F.Supp. 445; *Bronstein v. Bronstein* (E.D.Pa.1976) 407 F.Supp. 925. We render no opinion nor is it our purpose at this juncture to discuss, as the parties to this cause invite us to do, the merits and underlying policy considerations which attend the "sale of business" exception and the controversy which surrounds it. Suffice it to say that if Indiana is to consider the adoption of a state counterpart to the federal "sale of business" exception to the securities laws, the decision is more appropriately made by the General Assembly or by the Indiana Supreme Court.

Insofar as this determination affects appellants' ability to frame a cause of action or defense under the Indiana Securities Act antifraud provision, I.C. 23–2–1–12, we hold that they are not precluded from doing so by virtue of the structure of their transaction.

### IV.

### RETENTION OF COLLATERAL IN SATISFACTION OF DEBT

▇▇ Appellants argue that upon default, Fisher elected to retain the stock collateral in full satisfaction of the remaining note indebtedness, thus discharging them from any further obligation thereunder. They maintain that Fisher's acts of voting the stock, restoring himself as President of the company, resuming management and control of the company, locking appellants out of the company property, placing the company in a bankruptcy reorganization proceeding, and retaining the stock [for approximately eighteen months after default] without taking any action to "sell, lease, or otherwise dispose of the collateral" constitutes a retention of collateral, under § 9–505(2) of the Uniform Commercial Code [10] in full satisfaction of the debt.

Fisher disputes this contention, arguing that he did not retain the collateral in satisfaction of the debt under the UCC provision because he gave no written notice, as required by § 9–505(2), which would evidence an intent to retain the collateral; consequently, appellants are not discharged under the terms of this provision.

The general rules stating the rights of the secured party upon default are contained in UCC § 9–504 which provides that the secured party may "sell, lease, or otherwise dispose of the collateral in its then condition or following any commercially reasonable preparation or processing." Subsection (2) of § 9–504 requires the secured party, upon disposition of the collateral, to "account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiencies." However, § 9–505 furnishes an alternative to the general rules of disposition set forth in § 9–504 by allowing the secured party, under certain circumstances, to retain the collateral in satisfaction of the debt:

"COMPULSORY DISPOSITION OF COLLATERAL: ACCEPTANCE OF THE COLLATERAL AS DISCHARGE OF OBLIGATION

(2) *In any other case involving* consumer goods or *any other collateral a secured party in possession may, after*

10. Indiana has adopted the 1962 provisions of the Uniform Commercial Code's Article on Secured Transaction, found in Title 26, Chapter 9 of the Indiana Code. For purposes of this opin-ion, the relevant statutes will be denoted, generally, as UCC provisions rather than Indiana Code provisions.

*default, propose to retain the collateral in satisfaction of the obligation.* Written notice of *such proposal shall be sent to the debtor* and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or is known by the secured party in possession to have a security interest in it. If the debtor or other person entitled to receive notification objects in writing within thirty [30] days from the receipt of the notification or if any other secured party objects in writing within thirty [30] days after the secured party obtains possession the secured party must dispose of the collateral under section 9–504. *In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.*" (Emphasis supplied.)

The Official Comment prepared by the drafters of the Code explains the import of the statute, in part, as follows:

"In lieu of resale or other disposition the secured party may propose ... that he keep the collateral as his own, thus discharging the obligation and abandoning any claim for a deficiency."

There is nothing in the record before us suggesting that Fisher proposed, in writing or otherwise, that he should retain the stock collateral in satisfaction of the note indebtedness. Nonetheless, appellants urge that his actions, absent written notice, manifest an intent to retain the collateral, thus discharging the remaining obligation in its entirety.

The claim that a secured creditor should be held to have retained collateral in satisfaction of a debtor's obligation under UCC § 9–505, even though the security holder never proposed in writing to do so, has

elicited mixed responses from various courts. *See* Annot. 55 A.L.R.3d 651 (1974). Some courts have considered the language requiring written notice as mandatory, *Marine Midland Bank v. Connelly* (N.Y. 1981) 79 App.Div.2d 1102, 435 N.Y.S.2d 850; *Roylex, Inc. v. E.F. Johnson* (Tex.Civ. App.1981) 617 S.W.2d 760, disapproved in *Tanenbaum v. Economics Laboratory, Inc.* (Tex.1982) 628 S.W.2d 769; *Stensel v. Stensel* (1978) 63 Ill.App.3d 639, 20 Ill.Dec. 548, 380 N.E.2d 526; *Priggen v. Steel Buildings Co. v. Parsons* (1963) 350 Mass. 62, 213 N.E.2d 252, while others view the requirements more leniently by recognizing, where circumstances warrant, an implied retention of the collateral. *Service Chevrolet Inc. v. Sparks* (1983) 99 Wash.2d 199, 660 P.2d 760; *Tanenbaum v. Economics Laboratory, Inc., supra; Farmers State Bank in Afton v. Ballew* (Okla.App. 1981) 626 P.2d 337; *Haufler v. Ardinger* (Mass.App.Div.1979) 28 U.C.C.Rep.Serv. 893; *Winters National Bank & Trust Co. v. Saker* (1979) 66 Ohio App.2d 31, 419 N.E.2d 890; *Moran v. Holman* (Alas.1973) 514 P.2d 817; *Northern Finance Corp. v. Chatwood Coffee Shop, Inc.* (N.Y.Sup.Ct. 1967) 4 U.C.C.Rep.Serv. 674; *Bradford v. Lindsey Chevrolet Co.* (1968) 117 Ga.App. 781, 161 S.E.2d 904.

▮ A secured party should not be permitted to profit by his retention of collateral for an indefinite or unreasonable period of time by asserting his right to a deficiency amount on the debt, claiming that he had no intent to retain the collateral in satisfaction thereof as evidenced by the absence of written notice to retain. Therefore, there may be circumstances in which strict compliance with the written notice provisions of § 9–505(2) are not essential to a claim that the secured party, by his unreasonable conduct, retained the collateral in satisfaction of the debt.[11]

---

**11.** *Kruse, Kruse & Miklosko v. Beedy* (3d Dist. 1976) 170 Ind.App. 373, 353 N.E.2d 514 does not contradict our conclusion. The § 9–505 issue presented in *Kruse* dealt with the debtor's failure to lodge a timely objection to the secured party's written notice of his intention to retain the stock collateral in satisfaction of the debt.

The problem of whether the secured party may be held to have retained the collateral absent written notice was neither raised nor in issue. Therefore, we do not view the general summary of § 9–505(2)'s requirements, found at 538, as inclusive of written notice, to compel the same in the instant case.

The law is yet developing with respect to factors which may warrant such determination. Foremost among these considerations is the passage of time:

"There must be a *'reasonable' limit* to the length of time a secured party is permitted to hold collateral before it is deemed to have exercised its right to retain that collateral in satisfaction of the underlying obligation." *Service Chevrolet Inc. v. Sparks supra,* 660 P.2d at 763. (Emphasis original.)

*See also Nelson v. Armstrong v. Massey-Ferguson Credit Corp.* (1978) 99 Ida. 422, 582 P.2d 1100; *Haufler v. Ardinger, supra,* 28 U.C.C.Rep.Serv. 893; *Shultz v. Delaware Trust Co.* (1976) Del.Sup.Ct., 360 A.2d 576.

Except in clearest cases, the reasonableness of the time for the creditor to hold the collateral without giving notice before retention occurs is a question of fact. *Service Chevrolet Inc. v. Sparks, supra,* 660 P.2d 760; *Jones v. Morgan* (1975) 58 Mich. App. 455, 228 N.W.2d 419; *National Equipment Rental, Ltd. v. Priority Electronics Corp.* (E.D.N.Y.1977) 435 F.Supp. 236. In addition, it has been held that where the secured party destroys the collateral while it is in his possession, *Tanenbaum v. Economics Laboratory, Inc., supra,* 628 S.W.2d 769, or where his actions cause the collateral to depreciate in value, *Farmer's State Bank of Afton v. Ballew, supra,* 626 P.2d 337, or where his actions significantly diminish the resale value of the collateral, *National Equipment Rental, Ltd. v. Priority Electronics Corp., supra,* 435 F.Supp. 236, he will be found to have retained the collateral in complete satisfaction of the debt. Furthermore, the secured party's prolonged use of repossessed collateral in his business for many months prior to disposition has been held to constitute a retention under § 9–505. *Haufler v. Ardinger, supra,* 28 U.C.C.Rep. Serv. 893.

Other courts have simply held that, in the absence of written notice, a debtor seeking to prove that the secured creditor has retained the collateral in satisfaction of the obligation bears the burden to show that the creditor, in some way, manifested an intent to retain the collateral. *Nelson v. Armstrong v. Massey-Ferguson Credit Corp., supra,* 582 P.2d 1100; *Jones v. Morgan, supra,* 228 N.W.2d 419.

One case in particular is worthy of brief discussion. In *Winters National Bank & Trust Co. v. Saker, supra,* 419 N.E.2d 890, the secured party-bank held the debtor's stock as collateral for a promissory note and, upon the debtor's default, continued to hold the stock for twenty-two months before disposing of it. The debtor sought to charge the bank with retention of the collateral in satisfaction of the debt under UCC § 9–505. The Ohio Court of Appeals refused to find an implied election to retain the stock, despite the length of time for which the bank held the stock, because the bank had continued to send proxy statements to the debtors and to apply the stock dividends toward the debtor's obligation. In addition, it had given the debtors the option of redeeming the stock before it finally sold it. It may be inferred from this holding that so long as the secured party accords the debtor at least some of the rights traditionally associated with stock ownership, the secured party will not be considered to have retained the collateral, discharging the debt.

The prior discussion does not afford us alternatives for resolution of the question whether Fisher retained the stock collateral in satisfaction of the debt. Several threshold factual and legal determinations were not determined below and are in dispute.

(A)

### VALUE OF FISHER ENGINEERING STOCK

The first factual question, vigorously disputed by the parties, constitutes the heart of this case: What was the value of the Fisher Engineering stock at the time Fisher actively began voting the stock and resumed control of the company—in July of 1982?

Appellants claim that the stock's value exceeded the remaining indebtedness on

the promissory note. Fisher maintains that the stock was worthless.

As evidence of the net worth of the company, and thus, of the value of the stock, appellants rely upon the bankruptcy schedules filed by Fisher in the Chapter 11 proceeding. As scheduled by Fisher on August 11, 1982, the bankruptcy schedules show Fisher Engineering with assets totaling approximately $668,000, and debts totaling approximately $344,000. Subtracting total liabilities from total assets leaves capital, or net worth, of $324,000, an amount which exceeds appellants' remaining note balance of $310,000, by approximately $14,000. Based on these figures, appellants maintain that they were not only entitled to a credit against the remaining note indebtedness, but, in addition, were entitled to the surplus.

Fisher, on the other hand, asserts that the figures shown in the bankruptcy schedules are highly misleading in that the major asset item, listed in the amount of approximately $502,000, represents the "dime store" unsecured, undated, and uncollectible promissory notes executed in favor of Fisher Engineering by Wisconics and Zenner, which Fisher alleges, is the amount of money that appellants misappropriated from the company. Fisher argues that if the $502,000 paper asset is disregarded, the mathematic formulation leaves Fisher Engineering with a negative net worth of approximately $177,000, and, as a consequence thereof, the stock was worthless. We note that in any event, the Fisher Engineering stock brought a price of approximately $34,000 on the day of its disposition at a judicial sale, on October 10, 1983. The value of the Fisher Engineering stock must be resolved by the trier of fact.

Insofar as the stock value relates to the question whether Fisher retained the stock in satisfaction of the debt, various factual inferences may be permissible. A holder of stock collateral which was thought to be completely worthless would not reasonably propose or intend to retain it in satisfaction of the debt it secured, although we acknowledge that one in such a position might find it exceedingly difficult to find a market for such stock. On the other hand, a creditor who holds collateral whose value is thought to exceed the debt owing, might well intend to retain it and its surplus value as well, willingly discharging the debtor from his underlying obligation. In fact, § 9–505(2) was drafted in contemplation of this very consideration. Furthermore, if the trier of fact should find that the value of the Fisher Engineering stock exceeded the note indebtedness in the summer of 1982, a case might be made that the holder's actions caused it to diminish in value to approximately one-tenth of the former by the time the stock was finally sold in October, 1983. If such were true, a trier of fact might reasonably conclude, based upon considerations stated above, that the excessive diminution in value during the time for which the creditor retained the collateral before disposing of it constitutes a retention of the stock. Alternatively, it is impossible that such consequence would flow if the fact finder found the stock to be worthless at the time Fisher actively began to vote it, when he resumed control of the company. As noted, the resolution of this material factual issue is a necessary predicate to the resolution of the legal issues flowing therefrom.

(B)

## RIGHTS OF THE PARTIES UNDER THE PLEDGE AGREEMENT

As stated at the outset, this is an interlocutory appeal, the trial court having retained the issues presented in Counts II and III of Fisher's complaint. We find that at least one necessary legal determination bearing on the issues presented herein is still before the trial court.

Count II of Fisher's complaint seeks a declaration of the rights of the parties pursuant to the terms of the pledge agreement. The pledge agreement provides that Wisconics was to retain the voting rights in the stock except in the event of default. In addition, Fisher, as long as he held the stock as a pledgee, was to receive any and all dividends declared on the stock. The pledge agreement is silent as to whether,

upon default, the right to vote the stock vested in Fisher.

The determination of whether, under the pledge agreement, Fisher acquired the right to vote the stock upon default bears upon the question of whether Fisher's conduct constitutes a retention of the stock in satisfaction of the debt. If the trial court finds that the pledge agreement contemplated the vesting of voting rights in Fisher upon default, then appellants may not claim that the exercise of those rights—rights which appellants contracted away—constitutes a retention discharging them from their debt. In such circumstance, for a retention to have occurred, there must be something more—some further act, inconsistent with Fisher's rights in the collateral, which evidences his intent to retain the collateral in satisfaction of the debt.

### (C)
### SECURED PARTY'S INTENT

Finally, we note again, with approval, those cases which hold that a debtor may not avail himself of the discharge created in UCC § 9–505(2) unless he has established that the secured party, in some way, manifested an intent to retain the collateral in lieu of selling it for the debtor's account. *Nelson v. Armstrong v. Massey Ferguson Credit Corp., supra; Jones v. Morgan, supra.* Whether Fisher's conduct in voting the stock and in retaining it from the time of default, in April, 1982, until the time of disposition at the judicial sale, in October, 1983, may be construed as a manifestation of his intent to retain the stock in satisfaction of the debt must await the determination of the trier of fact.

### V.
### IMPAIRMENT OF COLLATERAL UNDER UCC § 3–606

■ Fitzpatrick and Zenner, as guarantors of the promissory note executed by Wisconics, argue that they are released from their personal obligation inasmuch as Fisher's actions, with respect to the stock collateral, constitute an impairment of collateral under UCC § 3–606, thereby discharging them.[12] The provision upon which they rely states:

"Impairment of Recourse or of Collateral

(1) *The holder discharges any party to the instrument to the extent that without such party's consent the holder*

(a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure or delay in effecting any required presentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary; or

(b) *unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.*"

Fitzpatrick and Zenner's position is similar to that presented in the previous issue. They argue that Fisher's acts of voting the stock, restoring to himself management and control of the company, and placing the company in a bankruptcy proceeding constitute an impairment under § 3–606 because such acts diminished the value of the stock and because the bankruptcy proceeding so fundamentally altered the attributes of stock ownership as to make the stock collateral unavailable to them and to impair their rights in the stock. They urge that the Article III provision must be construed broadly to include "in addition to conduct by the creditor which diminishes the value of the collateral, any unreasonable acts by the creditor which increase the risk of the guarantors or which make the collateral unavailable to the guarantors in the event of default." *Beneficial Finance Co. of*

---

12. Indiana has adopted Article III of the Uniform Commercial Code at I.C. 26–1–3 *et seq.*

*Norman v. Marshall* (Okla.App.1976) 551 P.2d 315.

UCC § 3–606 provides an accommodation party to an instrument (in this instance, the guarantors of a promissory note) with what is known as a "suretyship" defense if it can be proven that the holder of the instrument, by his conduct and without the accommodation party's consent, has taken or failed to take some action which unjustifiably impairs the collateral. *Southwest Florida Production Credit Ass'n. v. Schirow* (Fla.App.1980) 388 So.2d 338; *Wohlhuter v. St. Charles Lumber & Fuel Co.* (1975) 25 Ill.App.3d 812, 323 N.E.2d 134. An impairment of collateral under § 3–606 has generally been construed to mean injury to or deterioration in the value of the collateral. *Hurt v. Citizens Trust Co.* (1973) 128 Ga.App. 224, 196 S.E.2d 349. Impairment is not limited to a diminution in the value of the property; it also encompasses an impairment of a security interest in the collateral, *White v. Household Finance Corp.* (3d Dist.1973) 158 Ind.App. 394, 302 N.E.2d 828, and, as appellants urge, "unreasonable acts which make the collateral unavailable to the surety and increase his risk." *Beneficial Finance Co. of Norman v. Marshall, supra,* 551 P.2d 315.

For the same reasons stated with respect to Issue IV, we are unable to resolve the question whether Fisher's acts constitute an impairment so as to release Fitzpatrick and Zenner from their guaranty. Implicit in the determination, again, is the question of value. If, at the time Fisher voted the stock and resumed control, the stock was worthless, it is difficult to imagine that any action he took with respect to the stock could have "impaired" its value any more than its valueless condition at that time. *See e.g. Schauss v. Garner* (Wyo.1979) 590 P.2d 1316. Moreover, the guarantors bear the burden to show the *extent* to which the holder's actions impaired the collateral, for if they are to be discharged, it is only to the extent of the impairment. *VanBalen v. Peoples Bank & Trust Co.* (1981) 3 Ark. App. 243, 626 S.W.2d 205. In addition, if

the pledge agreement is found, by the trial court, to vest voting rights in Fisher upon default, then any action he took with respect to voting the stock and resuming control of the company was contractually given to him by Fitzpatrick and Zenner. Therefore, they may not be heard to complain that his actions were without their consent. Under this scenario, they are estopped from asserting UCC § 3–606 as a defense. *DeKalb County Bank v. Haldi* (1978) 141 Ga.App. 257, 246 S.E.2d 116. Furthermore, even if, *arguendo,* the collateral is impaired, the Code adds the additional requirement that the holder must have "unjustifiably" impaired the collateral. *First Citizens Bank & Trust Co. v. Larson* (1974) 22 N.C.App. 371, 206 S.E.2d 775. While we venture no opinion as to what may constitute a "justified" impairment, we note only that if the situation in the summer of 1982 was as Fisher claims—that Fisher Engineering was facing lawsuits by its creditors, insolvency, and unable to pay its current debts—we think a trier of fact might reasonably conclude that Fisher's actions were justified.

Finally, given the unresolved factual and legal matters which must first be determined by the trial court, we do not reach the viability of the novel theories upon which Fitzpatrick and Zenner premise this defense: (1) That the act of placing the corporation in bankruptcy so fundamentally alters the ownership rights in the stock as to constitute an impairment, and (2) that the conduct of a corporate officer (Fisher) in managing or mismanaging the company so as to cause a deterioration in the value of the corporate stock held as security by the corporate officer constitutes an impairment.

## VI.

### ATTORNEY'S FEES

In their motion to correct error, appellants challenged the trial court's award of $38,724.80 in attorneys fees as arbitrary and unsupported by evidence. According-

ly, the trial court modified the award, reducing it to $1206. The modification was based upon the trial court's finding that Fisher's counsel had, in connection with this action, expended 20.1 hours at a rate of $60 per hour. The findings reflect the affidavit of Fisher's attorney which states as much.

Appellants now assert that even though the modification is favorable, it is nonetheless arbitrary and unsupported by evidence. We do not agree.

 "The legal profession stands on the same plane with other professions in litigation involving professional fees. Proof is required of the nature of the services rendered and the reasonableness of the charge made." *Lystarczyk v. Smits* (3d Dist.1982) Ind.App., 435 N.E.2d 1011, 1017; *Loudermilk v. Casey* (1st Dist.1982) Ind.App., 441 N.E.2d 1379, 1387. Appellants do not challenge the reasonableness of the fees awarded. Their challenge is directed to whether the evidence supports such an award. The affidavit of Fisher's attorney, William Mills, is sufficient to do so.

However, because the award of attorneys fees was predicated upon a favorable judgment on the promissory note, and because we have found it necessary to reverse the judgment on the note owing to the existence of unresolved factual issues regarding appellants defenses, the award of attorneys fees must, likewise be reversed, pending the resolution of such issues before the trial court.

In conclusion we hold that appellants are precluded from asserting a defense of common law fraud. In all other respects, we reverse and remand to the trial court for further proceedings not inconsistent with this opinion.

SHIELDS, J., concurs.

GARRARD, J. (participating by designation) concurs.