**G. L. CANFIELD, Plaintiff-Appellee,**

v.

**RAPP & SON, INC.,
Defendant-Appellant.**

No. 80–2836.

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1981.

Decided July 6, 1981.

---

* Honorable Thomas A. Wiseman, Jr., United States District Judge, Middle District of Tennessee, sitting by designation.

Michael R. Fruehwald, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for plaintiff-appellee.

Donald S. Young, Dykema, Gossett, Sprencer, Goodnow & Trigg, Detroit, Mich., for defendant-appellant.

Before SWYGERT, Senior Circuit Judge, SPRECHER, Circuit Judge, and THOMAS, Senior District Judge.[*]

SPRECHER, Circuit Judge.

This case arises out of the sale of the business, through the sale of all of the stock, of Twigg Corp. ("Twigg") to Rapp & Son, Inc. ("Rapp") by G. L. Canfield and two other former owners of Twigg. Rapp alleges that the sale violated federal and Indiana securities laws and constituted common law fraud. After trial, the district court found that Rapp had failed to establish any of the material elements for recovery under the federal and state securities laws or for common law fraud. Moreover, the court found that the transaction in controversy did not constitute the sale of a "security" for purposes of the federal and state securities laws.

We find that the district court correctly anticipated this court's decision in *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981). In *Frederiksen*, we held that when a purchase of stock actually involves the purchase and assumption of control of an entire business, the transaction does not properly come within the scope of the federal securities laws. We

[*] Honorable Daniel Holcombe Thomas, Senior District Judge for the Southern District of Alabama, is sitting by designation.

find that the federal and state securities law claims here are governed by *Frederiksen*. Furthermore, we find that the district court's findings regarding Indiana common law fraud are amply supported. Therefore, we affirm.

## I

Twigg is an Indiana corporation engaged in the business of manufacturing machine parts, primarily for use in military aircraft and other defense contracting. Until December 31, 1976, Twigg's stock was owned 75% by Canfield, 20% by Andrew Neary, and 5% by Hobart T. Weber. In 1976, Canfield and the other owners of Twigg decided to sell the business. They employed a finder, Homer Cochran, to assist in locating a buyer. In October, 1976, Rapp placed an advertisement in the Wall Street Journal seeking "acquisition of a healthy company by principal, $500,000.00 to $2,000,000.00." Cochran put the parties in contact with each other, and serious negotiations began in early December, 1976.[1] On December 31, 1976, an "Agreement for Sale of Stock of Twigg Corporation" ("Agreement") was signed by Canfield, Neary, and Weber as sellers and Rapp as purchaser. The purchase price for all the Twigg stock was $2 million.

Rapp alleges that during the December negotiations, Canfield made certain misrepresentations about government equipment in the possession of Twigg. The equipment at issue consists of thirty machines or tables which, at the time of the sale, were leased by Twigg from the U. S. Air Force under a facilities contract. In 1976, the facilities contract was renewed through August 31, 1978.[2] In spring 1975, Twigg approached the Air Force regarding possible purchase of the equipment by Twigg. Subsequently, Twigg made a request to purchase the equipment, and Canfield began corresponding with the Air Force personnel involved in reviewing the purchase request.

In a December 6, 1976 meeting, Canfield informed Rapp's representatives of Twigg's request to purchase the government equipment and the status of the request at that time. Canfield also informed them of his understanding that if the sale was not approved or if no agreement was reached on the price, Twigg could continue to lease the equipment subject to renewals which previously always had been granted. In a later meeting, Rapp and Canfield agreed to a provision in the Agreement that Canfield would continue the negotiations with the government for the purchase of the equipment.

The testimony is conflicting with regard to other representations allegedly made by Canfield prior to execution of the December 31 Agreement. Rapp's primary claim is that Canfield represented, without any rational basis, that if Twigg chose to buy the equipment, the price probably would be $40,000 to $60,000, and the maximum price

1. Representatives of Rapp met briefly with Canfield in November, but discussions were halted due to the progress of talks between the sellers and another potential buyer. After talks with the other buyer fell through, Cochran informed Rapp of the continuing availability of Twigg and, consequently, negotiations resumed in December.

2. The facilities contract originally had been entered into between the Air Force and Twigg's predecessor, the Twigg Division of Altamil Corporation. The contract was assumed by Twigg Corporation along with other assets of the Twigg Division in 1971. The contract was subject to renewal upon request and proof of continued justification for possession of the equipment for defense contracting work. The facilities contract had been regularly renewed by Twigg throughout its existence.

Under the facilities contract, Twigg Corporation paid rent to the Air Force based upon a percentage of the original acquisition cost and the age of the machinery. Credit was given against the rent when the equipment was used for certain defense contracting work, so that, in essence, Twigg Corporation paid rent on the equipment only for nondefense contracting use of the machinery. The facilities contract stated the total acquisition cost for the thirty pieces as $688,000.00 and the years of manufacture of the various items as between 1942 and 1967. The rent paid by Twigg Corporation for the government equipment, called "contingent rental" in the audited financial statements, was approximately $30,000.00 per year in the years ending March 31, 1975 and 1976.

would be $100,000. In connection with Canfield's allegedly misleading price estimate, Rapp claims that Canfield made the following additional misrepresentations: (1) Canfield never disclosed that the government would require Twigg to purchase the equipment in order to maintain possession of it, but rather he represented that Twigg could continue to rent the equipment if it was not purchased; (2) Canfield falsely represented that he had prior experience in negotiating purchases of government equipment and also made representations as to how the negotiations would proceed, despite having no basis for making such statements; and (3) Canfield failed to disclose to Rapp that he was advised in May, 1975, that the government equipment had been "appraised" at a value of $356,250 and that the equipment could only be acquired at its fair market value.

Apparently, Rapp did not independently investigate the probable purchase price or value of the government equipment. There are no references to the equipment price in the Agreement. Article I, Section 6(b) of the Agreement states that "Twigg holds as lessee certain equipment owned by the United States Government Department of Air Force under leases which as last amended run until August 31, 1978." Article V, Section 1, Clause (g) provides that:

> G. L. Canfield agrees to use his best efforts to complete Twigg's negotiations for the purchase of the government owned facilities now in Twigg's possession, for which he shall be entitled to reimbursement for expenses, but shall not be otherwise compensated.

Twigg finally purchased the equipment in July, 1979, for $554,000. Rapp argues that in negotiating the Agreement, it relied on Canfield's alleged misrepresentations and omissions regarding the equipment. Rapp argues that, because Rapp had to buy the equipment at a price much higher than Canfield's estimated price, the stock was worth less than the $2 million Rapp paid. Rapp alleges that Canfield violated Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5; § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and the anti-fraud provision of the Indiana Securities Law, Ind. Code § 23–2–1–12; and that Canfield's conduct constituted common law fraud.[3]

The district court found that: (1) in his oral conversations with representatives of Rapp, Canfield did not make any misleading statements regarding the government equipment; (2) any speculation by Canfield as to the future purchase price for the government equipment would not have been material to a reasonable purchaser of Twigg; (3) Rapp did not rely on statements by Canfield regarding the future purchase price of the government equipment in arriving at the purchase price of Twigg; (4) Canfield did not intend to deceive Rapp, nor was his conduct reckless with respect to misleading Rapp; (5) Rapp was not damaged, because the value of Twigg as of December 31, 1976, was $2 million with or without speculation by Canfield about the result of future negotiations for purchase of the government equipment; and (6) Twigg's purchase of the government equipment in 1979 was a business judgment by Rapp and was not caused by Canfield's representations prior to the 1976 Agreement.[4] The court's findings negated every element of the federal and state securities law claims, as well as the Indiana common law fraud claim.

The court additionally found that Rapp failed to state a claim under the federal and state security laws because under these circumstances the transaction did not consti-

---

3. These allegations were raised by Rapp as counterclaims in the original action. Originally, Canfield filed suit against Rapp alleging breach of an agreement to contribute additional capital to Rapp as collateral security for the sale of Twigg capital stock. That claim eventually became moot, and only Rapp's counterclaims were tried by the district court.

4. The court also found, contrary to Rapp's claim, that if Twigg had decided not to purchase the equipment, it could have continued to use the equipment under conditions similar to those in existence before the sale of Twigg to Rapp. See note 2 supra.

tute the sale of a "security" for purposes of the securities laws.[5] The court stated that "the transaction entered into by the parties here, albeit a 'stock' sale involving stock as that term is commonly understood, was in reality merely a mechanism whereby the commercial purchase and sale of an entire company could be effectuated with the purchased stock serving only as an indicia of ownership." *Canfield v. Rapp*, IP 77–196–C, slip op. at 7 (S.D.Ind. November 28, 1980). We affirm the district court's holding that neither the federal nor state securities laws applies to this transaction. We also affirm the district court's rejection of Rapp's Indiana common law fraud claim.[6]

## II

In *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.), *cert. denied*, ___ U.S. ___, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), this court addressed the question of whether alleged fraud regarding the sale of stock incident to sale of an entire business falls within the scope of the federal securities laws. In *Frederiksen*, plaintiffs purchased both the assets and stock of the defendant-sole shareholder's corporation. Plaintiffs alleged that the interests they acquired in the corporation were "securities" within the meaning of the federal securities acts and that, in connection with the sale of these interests, defendant failed to disclose or misrepresented certain facts in violation of the federal securities acts.

In holding that the transaction in *Frederiksen* was not covered by the federal securities laws, this court relied on the leading Supreme Court case of *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). In *Forman*, the Court rejected the suggestion that because a transaction is evidenced by the sale of shares called "stock", it "must be considered a security transaction simply because the statutory definition of security includes the words 'any . . . stock.'" 421 U.S. at 848, 95 S.Ct. at 2058. Instead, the Court held that the applicability of the federal securities laws turns on "the economic realities underlying a transaction, and not on the name appended thereto." 421 U.S. at 849, 95 S.Ct. at 2059. The Court then set out a test which "embodies the essential attributes that run through all of the Court's decisions defining a security." 421 U.S. at 852, 95 S.Ct. at 2060. This "economic reality" test involves three elements: (1) an investment in a common venture; (2) premised on a reasonable expectation of profits; (3) to be derived from the entrepreneurial or managerial efforts of others. *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060; *Frederiksen*, 637 F.2d at 1152.

■ Rapp's purchase of Twigg clearly fails to satisfy the "economic reality" test.

---

**5.** Section 2 of the Securities Act of 1933, 15 U.S.C. § 77b defines "security" as follows:

When used in this subchapter, unless the context otherwise requires—

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The definition of "security" in the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)10 is substantially the same. The two definitions are considered functional equivalents. *Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–553, 19 L.Ed.2d 564 (1967). Moreover, the definition of "security" in the Indiana Blue Sky Law, Ind. Code § 23–2–1–1(k), is functionally equivalent to the federal definitions. *American Fletcher Mortgage Co., Inc. v. U. S. Steel Credit Corp.*, 635 F.2d 1247, 1253 (7th Cir. 1980), *cert. denied*, ___ U.S. ___, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981). Therefore, in discussing whether the transaction involved "securities", we do not differentiate among the state and federal laws involved.

**6.** We must reach the state law claim, despite dismissal of the federal law claims, because jurisdiction is based on diversity of citizenship of the parties. Rapp is a Michigan corporation and its principal place of business is in Michigan. Canfield is a citizen of Indiana.

The first element, investment in a common venture, requires a "sharing or pooling of funds." *Frederiksen*, 637 F.2d at 1152; *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 101 (7th Cir. 1977). Since Rapp purchased all of the stock of Twigg, there was no sharing or pooling of funds.

Rapp also fails to satisfy the third element of the economic reality test—that profits be derived from the efforts of others. Rapp took over management and control of Twigg. As stated at trial by Rapp's accountant, after the acquisition, Twigg and Rapp became "one and the same entity," Tr. 193, 201, and management was under the direction of Rapp and his interests, Tr. 201. Although Canfield agreed to negotiate the purchase of the government equipment for Twigg, Canfield's remaining participation in Twigg does not constitute reliance by Rapp on Canfield for "those essential managerial efforts which affect the failure or success of the enterprise." *Frederiksen*, 637 F.2d at 1153, *quoting S.E.C. v. Glenn W. Turner Enterprises*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). Finally, the employment contracts with Neary and Weber did not delegate "essential managerial decisions," but left them subject to direction by the board and Twigg itself, which were both controlled by Rapp. Thus, the "economic realities" of the transaction indicate not a security transaction, but rather the sale of a business, merely using stock as a method of vesting Rapp with total ownership of Twigg.

Rapp attempts to distinguish *Frederiksen* in two ways. First, Rapp argues that the *Forman* "economic reality" test does not apply if a transaction involves "stock" that has all the attributes of ordinary common stock. Rapp relies on the interpretation of *Forman* set forth in *Coffin v. Polishing Machines, Inc.*, 596 F.2d 1202, 1204 (4th Cir. 1979), *cert. denied*, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979). The *Coffin* court stated:

> *Forman* requires us to analyze the substance of a transaction only when the stocks involved do not have the "significant characteristics typically associated with the named instrument." . . .

Absent some showing that ordinary corporate stocks are other than what they appear to be, we need not consider whether an investor will derive his profit partly from his own efforts. That test, drawn from *SEC v. Howey Co.*, 328 U.S. 293, 298, 66 S.Ct. 1100 [1102], 90 L.Ed. 1244 (1946), applies to interest not easily recognized as securities in the capital market. It does not apply to stock that comes within the clear language of the securities acts. The court in *Forman*, for example, applied the *Howey* test only after deciding that the shares under consideration were not like ordinary capital stock.

(citations omitted)

But, as noted earlier, the *Forman* Court held that the economic reality test "embodies the essential attributes that run through all of this Court's decisions defining a security." 421 U.S. at 852, 95 S.Ct. at 2060. The Court did not exempt any particular type of security from the test. Defendant and the *Coffin* court may have been misled by the *Forman* Court's discussion of the significance of the name attached to an alleged security. The Court held that the name of an instrument, combined with its characteristics, are factors in determining the "economic realities" of the instrument. The Court stated:

> In holding that the name given to an instrument is not dispositive, we do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as "stocks" or "bonds" will lead a purchaser justifiably to assume that the federal securities laws apply. This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument.

421 U.S. at 850–51, 95 S.Ct. at 2059–60. In this passage, the Court held that the name and characteristics of the instrument are factors to consider in applying the economic

reality test. In order to determine whether these factors are dispositive, it still is necessary to look beyond the form of the instrument involved to the reality of the particular transaction.

Therefore, as we stated in *Frederiksen*, we reject the *Coffin* court's interpretation of the passage in *Forman* cited above:

We are not persuaded that the cited passage supports the *Coffin* court's conclusion. Our reading of *Forman* is that an "economic reality" assessment might be required by *Forman* even if the stocks involved do have some characteristics typically associated with investment securities. As the *Forman* Court stated:

Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto.

421 U.S. at 849, 95 S.Ct. at 2059. This language implies that the "economic reality" of a transaction is *always* a key issue. 637 F.2d at 1152 n.2 (emphasis added). We now reaffirm our holding that "economic reality" is always the key issue. *See Anchor-Darling Industries, Inc. v. Leonard Suozzo*, 510 F.Supp. 659 (E.D.Pa.1981); Comment, *Acquisition of Businesses Through Purchase of Corporate Stock: An Argument for Exclusion From Federal Securities Regulation*, 8 Fla.St.L.Rev. 295 (1980).

Moreover, the *Coffin* court's analysis of the facts of that case indicates that it did consider the economic realities of the transaction. In *Coffin*, defendants induced plaintiff to purchase 50% of the defendant corporation's stock and become its executive vice-president. The court stated:

Indeed, the descriptive report supplied to Coffin during the negotiations indicates that Polishing Machines wanted to sell stock in order to finance corporate expansion. Thus, the transaction appears to be the very sort of transfer with which the federal securities laws are most concerned, "the sale of securities to raise capital for profit-making purposes."

*Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621.

596 F.2d at 1204. This statement indicates that even the *Coffin* court might find no security transaction where, as here, the stock sale was a vehicle to transfer ownership and control of a business in its entirety, rather than a method of raising additional capital to finance expansion. Thus, we reject Rapp's argument that, because the stock sold here has some of the indicia of ordinary stock, we should not apply the economic reality test.

Second, Rapp attempts to distinguish *Frederiksen* on its facts. Rapp argues that *Frederiksen* primarily involved the sale of assets of the business and only secondarily involved the sale of stock. In *Frederiksen*, the purchase price of the corporate assets was over $190,000. An escrow fund was established with $160,000 of the assets purchase price in order to satisfy the liabilities of the selling corporation. A separate stock purchase and voting trust agreement provided that defendant would sell 10% of his stock for $10 and, for an additional $10, would transfer his remaining 90% of the corporation's stock into a voting trust controlled by the buyer-plaintiff. The stock in the voting trust was to be redeemed by the selling corporation from the remainder of the $160,000 escrow fund left after satisfying the corporation's debts.

Rapp argues that, in *Frederiksen*, the predominance of the asset sale was the key indicator of the sale of a business, rather than a sale of securities. Here, however, the transaction involved only the sale of stock. Here, the parties labeled their contract an "Agreement for Sale of Stock of Twigg Corporation." Pursuant to the Agreement, Rapp purchased 100% of the capital stock of Twigg, not Twigg's assets. But, despite the facial differences between the transaction here and in *Frederiksen*, an "economic reality" analysis of the transaction here indicates the sale of a business, not securities. To find that a sale of 100% of the stock brings the transaction within the securities laws, while a sale of assets plus 100% of the stock does not, would exalt

form over substance. The economic reality test requires us to look beyond the parties' method of structuring the transaction. There is no doubt that when Rapp purchased 100% of the Twigg stock, Rapp purchased the entire business. A separate sale of assets would have added nothing to the economic reality of the transaction.[7] Therefore, we find that the district court correctly dismissed Rapp's federal and state securities claims.

### III

Next, we turn to Rapp's remaining claim, Indiana common law fraud. In *Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34 (7th Cir. 1980), this court recently summarized the Indiana law of fraud as follows:

> Under Indiana law, the essential elements of actionable fraud are representations, falsity, scienter, deception, and injury. *Middelkamp v. Hanewich*, 147 Ind. App. 561, 263 N.E.2d 189 (1970). A fraud action must be predicated upon statements of existing facts, not promises to perform in the future. *Conant v. Terre Haute Nat'l State Bank*, 121 Ind. 323, 22 N.E. 250, 251 (1889). Nor do expressions of opinion qualify as fraudulent misrepresentations.

633 F.2d at 45. *See also Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 42 (Ind.Ct.App.1980); *Plumley v. Stanelle*, 160 Ind.App. 271, 311 N.E.2d 626, 630 (1974).

■ Based upon its findings of fact, the district court concluded that Rapp had failed to prove any of the essential elements of fraud—misrepresentation, scienter, reliance, causation, and damages. Furthermore, the court found that the alleged misrepresentations by Canfield related to opinions about future events. Such statements cannot be the basis for fraud because establishment of fraud under Indiana law requires statements of fact, not opinion, that relate to existing or past facts, not future events.

■ The district court's findings of fact will be set aside only if they are clearly erroneous. Fed.R.Civ.P. 52(a).[8] After reviewing the record, we conclude that the district court's findings were not clearly erroneous. The record indicates that each alleged misrepresentation by Canfield was simply an opinion as to future events, upon which no reasonable purchaser of Twigg would rely. First, Rapp claims that Canfield's alleged statements regarding the future purchase price of the government equipment were false in light of Canfield's knowledge of the appraised value of the

---

7. Rapp also argues that because the transaction was structured as a stock sale, it justifiably assumed that the federal securities laws applied to this transaction. We find that assumption unjustified. As discussed above, the *Forman* Court acknowledged that there may be cases where use of a traditional name, such as "stock", will lead a purchaser justifiably to assume that the federal securities laws apply, especially when some of the typical characteristics of stock are present. 421 U.S. at 850–851, 95 S.Ct. at 2059–2060. But, while the stock purchased by Rapp had the characteristics of ordinary stock, such as the right to receive dividends and voting rights, in the hands of Rapp, this stock was not ordinary capital stock.

Unlike the ordinary investor in ordinary capital stock, Rapp acquired total control over those very characteristics—dividends and votes. When a purchaser acquires 100% of the stock of a corporation and, therefore, for example, can confer dividends on itself at will, the fact that dividends are a characteristic of ordinary capital stock does not give rise to a justifi-

able assumption that the federal securities laws apply. That the parties labeled the Agreement a "stock" sale does not change the economic reality of the transaction. In light of the economic reality of the Twigg purchase, Rapp's alleged assumption that the securities laws applied was not justifiable.

8. Rapp argues that, since the district court adopted Canfield's proposed findings of fact verbatim, we should scrutinize those findings more broadly than usual. We agree that we must review the record carefully in such cases, but emphasize that the "clearly erroneous" standard still applies. *Hayes v. Thompson*, 637 F.2d 483, 490 (7th Cir. 1980); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 731 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *Schwerman Trucking Co. v. Gartland Steamship Co.*, 496 F.2d 466, 474–75 (7th Cir. 1974); *FS Services, Inc. v. Custom Farm Services, Inc.*, 471 F.2d 671, 676 (7th Cir. 1972).

equipment and the government's existing policy requiring payment of fair market value for the equipment. Canfield, however, claims that when he gave his rough price estimates, he merely was giving an example of a hypothetical opening offer by Twigg and the response by the government. At worst, Canfield was mistaken in his opinion as to the probable purchase price of the government equipment. In any case, the district court weighed the conflicting evidence and concluded that Canfield's statements were merely statements of opinion. We find no reason to disagree with that finding.

Similarly, Canfield's opinion as to whether Twigg could continue to rent the equipment from the government was just that, an opinion, and probably was reasonably based on Twigg's past renewals of the equipment leases. Rapp attempts to twist Canfield's opinion into a misrepresentation as to the government's *present* policies and procedures. But the subject of the alleged misrepresentation undeniably was *future* events. Furthermore, any statement by Canfield regarding the course of negotiations with the government could be nothing but an opinion as to future events, since it depended on the actions of a third party—the government—over which Canfield had no control.

Rapp argues that even if Canfield's statements regarding the equipment purchase price and the opportunity to continue leasing the equipment were opinions, they still are actionable fraud. Rapp cites Indiana fraud cases which hold that even if defendants' misrepresentations were subjectively meant to be merely opinions, where those alleged opinions were stated as presently existing facts and were justifiably relied upon by plaintiffs, there is actionable fraud. *See Fleetwood*, 404 N.E.2d at 43–44; *Vernon Fire & Cas. Ins. Co. v. Thatcher*, 152 Ind.App. 692, 285 N.E.2d 660, 669 (1972), *transfer denied*, 260 Ind. 55, 292 N.E.2d 606 (1973). But, these cases do not make an exception to the rule that statements expressed as opinions about future events are not actionable fraud. Rather, these cases only prevent defendants from later claiming that a statement was meant as an opinion, when it originally was stated as an existing fact and plaintiffs justifiably relied on it as true. Furthermore, in both *Fleetwood* and *Thatcher*, the alleged opinions misrepresented facts which defendants either knew or should have known.[9]

Here, on the other hand, Canfield's statements were not framed as statements of facts. Indeed, there is no way Canfield's statements could have been given as anything *but* opinions. The subject of Canfield's statements was the course of future negotiations with the government. Thus, the statements fall squarely within the rule that only misrepresentations of existing facts, not predictions of future events, can form the basis of an action for fraud.

■ This brings us to the final misrepresentation alleged by Rapp, that Canfield claimed to have presently existing expertise in acquiring government equipment. This alleged misrepresentation is the only one that relates to present facts rather than predictions of future events. But the rec-

---

9. In *Fleetwood*, defendant told plaintiffs that pursuant to a stockholders resolution, plaintiffs were obligated to sell their stock at $500 per share. In reality, the resolution directed that the company's net fixed assets be sold at a price netting each shareholder at least $500 per share. The court held that not only did defendant make "no attempt to show that his statement regarding the effect of the resolution was only his personal opinion," but the truth of his statement "was a *fact* [defendant] would have know [sic] via the various positions he held with the corporation." 404 N.E.2d at 44 (emphasis added).

In *Thatcher*, an insurance agent told plaintiffs that certain property was covered by their policy. After the property was destroyed, it turned out not to have been covered. The court found that the insurance company's agents could and should have ascertained whether the property was covered by the policy before making any statements concerning it. Therefore, "[i]f they were subjectively stating mere opinions they were reckless in stating them as facts without first having ascertained their truth." 285 N.E.2d at 670.

ord supports the district court's finding that Canfield made no misleading statements.[10] Canfield had experience in possession and use of equipment under government facilities contracts, but, he admitted, no experience in the purchase of such equipment. The record does not support Rapp's argument that Canfield professed expertise specifically in purchase, as opposed to possession and use, of government equipment. Perhaps Rapp inferred from Canfield's manner that Canfield's predictions as to the purchase price would turn out to be more accurate than they were. But such inferences were not the product of any misrepresentations by Canfield.

## IV

For the foregoing reasons, we affirm the district court's finding that this transaction does not fall within the scope of the federal and state securities laws. Therefore, the federal and state security law claims were properly dismissed. Furthermore, we affirm the district court's finding that the alleged misrepresentations by Canfield do not give rise to a common law fraud action under Indiana law. The judgment of the district court is

Affirmed.

---

**10.** The alleged misrepresentations as to Canfield's expertise in government acquisitions were not pleaded separately, but were just one aspect of the misrepresentations regarding the purchase price for the government equipment claimed by Rapp. We note that even if we found that Canfield misrepresented his expertise, that alone would not constitute a false statement of a material fact in the absence of misrepresentations of currently existing facts regarding the price of the equipment.