**Gale E. DRYDEN, Plaintiff,**

v.

**SUN LIFE ASSURANCE COMPANY OF CANADA, Defendant.**

**No. IP 87–1189–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 12, 1989.

Richard N. Bell, Cohen & Malad, Indianapolis, Ind., for plaintiff.

Cory Brundage, Ice Miller Donadio & Ryan, Bette Dodd, Indianapolis, Ind., for defendant.

## ENTRY

DILLIN, District Judge.

This cause is before the Court on the motion of defendant, Sun Life Assurance Company of Canada (Sun Life), a mutual life insurance company, to dismiss the third amended complaint of the plaintiff, Gale E. Dryden (Dryden). For the following reasons, the defendant's motion will be granted.

### Background

Plaintiff Dryden initiated this action by filing a multicount complaint in this court on November 6, 1987. The initial complaint alleged that Sun Life, along with its officers and directors, had violated Federal and Indiana securities law, breached its insurance contracts with Dryden, committed racketeering acts in violation of Federal and Indiana law, and defrauded Dryden and other policyholders. Dryden later amended these allegations in a second amended complaint.

On June 3, 1988, Dryden filed a third amended complaint. In this complaint, Dryden dropped his federal and state racketeering charges against Sun Life. Later, on August 11, 1988, Dryden voluntarily dismissed the individual officers and directors of Sun Life who had been named as defendants. Thus, Sun Life is now the sole remaining defendant.

In his third amended complaint, Dryden alleged that he purchased four participating, whole life insurance policies from Sun Life in 1958, 1959, 1966 and 1973. Dryden attached portions of his insurance policies with Sun Life as exhibits to the complaint. Those portions of Dryden's policies and policy applications which were not attached as exhibits were later submitted by Sun Life. Each of the two policy applications which Dryden completed to acquire his four policies stated that Sun Life reserved the power to alter the company's method of distributing the company's divisible premium surplus.

On August 1, 1986, Sun Life instituted a new program referred to as "Operation Equity." The initial Operation Equity memorandum to participating policyholders is attached as Exhibit E to Dryden's original complaint. This memo states in essence that policyholders who did not borrow against their participating whole life policies would receive higher policy dividends from the company's divisible surplus due to a new method of dividend apportionment.

This new method of apportionment, the memo explained, took account of the fact that nonborrowing policies contributed more to the company's surplus than did borrowing policies. That is, policyholders who did not take out loans against their policies enabled Sun Life to invest their premium contributions at higher market rates of interest. Thus, nonborrowing policyholders would receive higher dividends under Operation Equity. Conversely, since the interest rate on policy loans was lower than the market rate of return on investments, borrowing policyholders would receive reduced dividends in the future under Operation Equity.

In addition to this memo, Sun Life sent letters to Dryden explaining that because he had borrowed against his policies, he would receive diminished dividends under Operation Equity. These letters, which detailed the precise reductions in Dryden's dividends under each policy due to the new allotment, were also attached as exhibits to Dryden's complaint.

After setting out these facts and incorporating the exhibits, Dryden asserted that Operation Equity in effect converted his participating whole life insurance policies into securities. Since Sun Life had not filed required Securities and Exchange Commission (S.E.C.) or Indiana registration or disclosure statements for its policies, Dryden charged Sun Life with numerous Federal and Indiana securities law violations. Dryden went on to claim that Sun Life violated Indiana's statute forbidding unfair discrimination against life insurance policyholders of the same class. Also, Dryden claimed that by instituting Operation

Equity, Sun Life breached its insurance contracts and defrauded policyholders through numerous omissions and misrepresentations of material fact regarding the effect of Operation Equity.

In addition, Dryden sought to have this cause certified as a class action. The class was to include policyholders like Dryden who allegedly kept their policies with Sun Life in anticipation of promised higher dividends under Operation Equity, but who in fact received smaller dividends because of their policy borrowing.

On February 29, 1988, Sun Life moved to dismiss Dryden's complaint on the merits under Rule 12(b)(6), F.R.Civ.P., for failure to state a claim on which relief may be granted. In sum, Sun Life argues that Dryden's complaint should be dismissed because the whole life policies in question were not "securities" under Federal or State law, that Sun Life did not breach its insurance contracts with Dryden because it had expressly reserved the power to alter the method of dividend allotment in the insurance contracts, and that Dryden had failed to state a claim for fraud in part because his allegations regarding Operation Equity were clearly refuted by the Operation Equity materials which Dryden attached to his complaint.

## Discussion

Defendant Sun Life has moved to dismiss Dryden's complaint under Rule 12(b)(6), F.R.Civ.P. The basic test for dismissal under Rule 12(b)(6) is whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). The allegations of the complaint are taken as true, and "the complaint is to be liberally construed in favor of plaintiff." *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404, 416–17 (1969).

### I. Federal Securities Violations

█ Counts II–V of Dryden's amended complaint allege that Sun Life violated provisions of the Federal Securities Act of 1933 (the 1933 Act) and the Federal Securi-

ties Act of 1934 (the 1934 Act). Specifically, Count II alleges that Sun Life sold unregistered securities in violation of the 1933 Act, codified at 15 U.S.C. § 77$l$(1). Count III alleges that Sun Life defrauded its policyholders in connection with the sale of securities as prohibited by the 1933 Act under 15 U.S.C. § 77$l$(2). Count IV alleges that Sun Life violated the 1934 Act by employing a manipulative device to sell a security as prohibited by 15 U.S.C. § 78j(b). Count V charges that Sun Life used communications in interstate commerce to sell securities in violation of the 1933 Act as codified at 15 U.S.C. § 77q(a).

Sun Life asserts that the Court must dismiss Counts II–V because its participating whole life insurance policy is not a "security" as that term is defined in the 1933 and 1934 Acts. For example, insurance policies are not listed in the following definition of a security under the 1933 Act:

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit sharing agreement, collateral-trust certificate ... [or] investment contract....
> 15 U.S.C. § 77b (West Supp.1989).

In fact, the 1933 Act expressly exempts insurance policies from regulation as securities. The Act provides in pertinent part as follows:

> (a) Except as herein after expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities ...
>
> (8) Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia. 15 U.S.C. § 77c(a)(8) (1981).

Moreover, it is well established that the definition of a security under the 1933 Act is "virtually identical" to the definition of a security under the 1934 Act. *Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 553, 19 L.Ed.2d 564, 569 (1967).

Plaintiff responds that the Sun Life policies are not standard life insurance policies. Rather, he argues that the right to receive "dividends" under the policies gave him a stake in Sun Life's investment profits. Moreover, he adds that the board's unfettered discretion under the policies to pay or not to pay a dividend caused him to bear the risk of Sun Life's investment profits. Dryden's argument is unavailing.

In short, plaintiff has identified two important characteristics of a "security": that the purchaser bears the risk of the investment and reasonably expects to share in the profits generated by the investment. In *S.E.C. v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), (*VALIC*), the Supreme Court ruled that a variable annuity contract was a security. Justice Douglas held that the annuity was really a security because the annuity company did not agree to pay the annuitant a fixed sum in return for his premium payments. *Id.* at 71–73, 79 S.Ct. at 621–23, 3 L.Ed.2d at 644–45. Instead, the size of the annuitant's payment was based solely on the performance of the company's investment portfolio. *Id.* Thus, given that there was "no true underwriting of [the annuitant's] risk" by the company, the Court concluded that the annuity was a security subject to the Federal Securities Act. *Id.*

In *S.E.C. v. Howey*, 328 U.S. 293, 295–97, 66 S.Ct. 1100, 1101–02, 90 L.Ed. 1244, 1248 (1946), the Supreme Court held that although the transaction in question resembled the sale of land, the transaction was in fact the sale of a security. Individual investors were encouraged to purchase acreage in a citrus grove. The purchase price included the services of a farming corporation which had the exclusive right to cultivate and market the citrus crop. Investors were then paid a share of the profits earned. The Court held that the "land sales contract" was in fact an "investment contract" and thus a security because "individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of

someone other than themselves." Id. at 298, 66 S.Ct. at 1103, 90 L.Ed. at 1249.

In contrast, Dryden neither bore the risk of Sun Life's investments nor could he have reasonably expected to share in Sun Life's investment profits. First, unlike the annuity discussed in *VALIC*, Dryden's policies required Sun Life to make a fixed payment at his death to a designated beneficiary. Regardless of the performance of Sun Life's investments, the company is obligated to pay this fixed sum. Thus, Sun Life, and not Dryden, bears the risk of any loss caused by the poor performance of its investments. Consequently, in the case at hand there was a "true underwriting of risks, the one earmark of insurance as it has commonly been conceived of in popular understanding and usage." *VALIC*, 359 U.S. at 72–73, 79 S.Ct. at 623, 3 L.Ed.2d at 645.

Second, Dryden could not have reasonably expected to share in Sun Life's investment profits. Dryden's argument that he expected to share in the profits of Sun Life stems from his confusion regarding how "dividends" paid on a participating life insurance policy differ from "dividends" paid on stock investments.

Under a participating life insurance policy issued by a mutual insurance company, the "dividends" paid are in fact a return of excess premiums paid in by the policyholder, rather than a share of the company's investment profits. In *Fidelity & Casualty Co. v. Metropolitan Life Ins. Co.*, 42 Misc.2d 616, 248 N.Y.S.2d 559 (N.Y.Sup.Ct. 1963), the Court explained the nature of "dividends" under a participating life insurance policy as follows:

> Since a mutual company is operated wholly for the benefit of its policyholders, it functions to provide insurance at cost rather than to amass profits in the ordinary business sense. While the initial premium paid by the policyholder usually represents a somewhat inflated estimate of the cost of the policy, at the end of the year when such cost is actually ascertained, the company is required to return to its policyholders the excess premium, that is the amount in excess of

the company's actual cost. Such return is accomplished by means of a distribution of the "divisible surplus" in accordance with the mandate of [New York insurance law]. The distribution of divisible surplus is in reality an adjustment of the premium in retrospect of the amount found to have been actually necessary to cover the contingencies which materialized and it effects a reduction in the cost of the insurance. *Id.* 248 N.Y. S.2d at 566 (citations omitted).

Thus, "the dividends of a mutual life insurance company are not ... profits as in the case of an ordinary corporation." *Rhine v. New York Life Ins. Co.*, 248 A.D. 120, 289 N.Y.S. 117, 123, *aff'd* 273 N.Y. 1, 6 N.E.2d 74 (1936). Indeed, as one district court has observed, "[i]t is not the expectation of anyone buying these kinds of policies that they are going to be sharing in the profits of a company." *Collins v. Baylor*, 302 F.Supp. 408, 411 (N.D.Ill.1969). Rather, "the policyholder creates his own surplus, by paying more for his insurance in advance than it should actually cost, based upon the mortality tables." *Rhine*, 289 N.Y.S. 117, *aff'd* 273 N.Y. 1, 6 N.E.2d 74 (1936). At the end of the year, this surplus, rather than the profits of the company, is paid pro rata to the policyholders. *Id.* Consequently, Dryden could not have expected to share in the profits generated by Sun Life's investment portfolio. All that he could have expected to receive was his pro rata share of the premium surplus.

Therefore, it is clear that under the original Sun Life policies, Dryden did not bear the risk of Sun Life's investments or reasonably expect to share in Sun Life's investment profits. Thus, the original Sun Life policies were not securities as that term is defined under the 1933 and 1934 Acts. *S.E.C. v. Variable Annuity Life Ins. Co. of America (VALIC)*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); *S.E.C. v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

Plaintiff contends that even if the original Sun Life policies were not securities, Sun Life's "Operation Equity" in effect converted them into securities. In his brief

opposing the motion to dismiss, Dryden argues that Sun Life led policyholders to believe that they could expect an increase in their policy dividends of 30% or more because of Operation Equity. He notes that the Operation Equity announcement claimed that "Sun Life of Canada is taking policyholder dividends to history-making heights with a new program called Operation Equity."

From this announcement, Dryden reasons that Operation Equity has increased the funds available for Sun Life to invest; consequently, individual policyholders like himself have a "real interest" in sharing in Sun Life's investment profits. In this way, Dryden argues in effect that he and the other policyholders "were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of [others]," so that the insurance policies were in fact securities. *S.E.C. v. Howey*, 328 U.S. 293, 295–97, 66 S.Ct. 1100, 1101–02, 90 L.Ed. 1244, 1248 (1946).

Once again, Dryden misunderstands the nature of a mutual insurance company and its dividends. Also, his reading of the Operation Equity memorandum is too selective. The Operation Equity memorandum regarding Operation Equity explains that

> when people take loans against their policies, the pool of funds available for investment by the company is reduced. Since the interest rates on policy loans for our older policies are now considerably below rates of return available on our outside investments, the total investment return to the company is reduced when policy loans exist.

Accordingly, the Operation Equity memo stated that in the future, dividend payments to policyholders would directly reflect whether the policyholder had taken out loans against their policies. The effect of Operation Equity was succinctly described as follows:

> The effect is that loaned policies and unloaned policies will no longer receive the same dividends.

Thus, Operation Equity merely refocused the method of apportioning Sun Life's divi-

sible premium surplus among its policyholders. As noted above, in a mutual insurance company, the policyholder in effect creates his own surplus by paying more for his insurance in premiums then its actual cost based on mortality tables. *Rhine,* 289 N.Y.S. 117, *aff'd* 273 N.Y. 1, 6 N.E.2d 74 (1936). The only difference under Operation Equity is that the amount of premium surplus which is returned to a particular policyholder depends on the extent to which that policyholder actually contributed to the surplus. Obviously, if the policyholder has taken out a loan against his policy, he has reduced the amount which Sun Life can invest and thereby reduced the size of Sun Life's divisible surplus.

Therefore, Operation Equity did not change the basic nature of Dryden's contract from an insurance policy to a security. Indeed, even after Operation Equity, Dryden paid fixed premiums so that Sun Life would pay a fixed amount to his beneficiary at his death. Because the insurance policies in question are not securities under either the 1933 or 1934 Act, Counts II–V of Dryden's complaint must be dismissed pursuant to Rule 12(b)(6), F.R.Civ.P.

The Court also notes that the Seventh Circuit has recently held that there is no private right of action under 15 U.S.C. § 77q(a). *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 942–43 (7th Cir.1989.) Thus, even if the policies in question were securities, Count V of Dryden's complaint would be dismissed.

II. Indiana Securities Law Violations

Sun Life has also moved to dismiss Count VIII of Dryden's complaint which alleges that Sun Life made fraudulent statements and omissions in connection with the sale of its insurance policies in violation of Indiana Securities Law. Dryden also asserts that Sun Life's whole life insurance policies were actually unregistered securities.

Under Indiana law, the definition of a "security" includes the following exclusion:

"Security" does not include:

(i) Any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or some other specified period.... Ind.Code 23–2–1–1(k)(i) (West Supp.1988). Given this exclusion of insurance from the definition of a security, courts have concluded that the Indiana definition is "functionally equivalent to the federal definitions" of a security under the 1933 and 1934 Federal Securities Acts. *Wisconics Engineering, Inc. v. Fisher,* 466 N.E.2d 745, 760 (Ind.App.1984) (quoting *Canfield v. Rapp & Son, Inc.,* 654 F.2d 459, 463 n. 5 (7th Cir.1981)).

Accordingly, for the reasons stated above regarding the federal securities counts, Sun Life's whole life insurance policies are not securities under Indiana law. Therefore, Count VIII of Dryden's complaint alleging securities fraud and the sale of unregistered securities must be dismissed pursuant to Rule 12(b)(6), F.R. Civ.P.

III. Unfair Discrimination

In Count IX of his complaint, Dryden contends that Sun Life's practice of paying smaller dividends to policyholders who borrow against their policies under Operation Equity constitutes discrimination in violation of Ind.Code 27–4–1–4(7)(A) (1988). In pertinent part, this provision of the Indiana Code prohibits "unfair discrimination between individuals of the same class and equal expectation of life ... in the dividends or other benefits payable" on any contract of life insurance. *Id.*

Sun Life's motion to dismiss Count IX of Dryden's complaint must be granted. As Sun Life correctly notes in its brief, there is no private right of action under the Unfair Competition Article of Indiana's Insurance Code. Ind.Code 27–4–1–18. Instead, only the Indiana Insurance Commissioner, or a person appealing from an order of the Commissioner, may bring a cause of action under the unfair discrimination provisions on which Dryden relies.

IV. Breach of Contract

In Count VII of his third amended complaint, Dryden asserts that he has performed all of the conditions of his four

insurance policies. Then he alleges that "Sun Life, through the institution of its 'Operation Equity' program[,] unilaterally and without exchanging consideration materially altered the terms and conditions of said insurance contracts," thereby damaging him. In order to state a claim for breach of contract in Indiana, the plaintiff must allege, *inter alia,* the nonperformance or defective performance of a contractual obligation by the defendant. *Strong v. Commercial Carpet Co.,* 163 Ind.App. 145, 322 N.E.2d 387, 391 (1975).

Dryden's breach of contract claim must fail because the Sun Life insurance applications, insurance policies, and by-laws reserve to the company the right to change the method of distributing its divisible premium surplus. Each of Dryden's policies provides that "[t]he policy and the application thereof, a copy of which is attached, constitute the entire contract" between Dryden and Sun Life. Thus, the terms of the insurance applications are expressly incorporated as terms of the insurance contract.

Dryden completed two insurance applications, dated September 16, 1958, and August 10, 1959, which state in pertinent part that "the Company [Sun Life] will have the right to adopt or change any basis or method for any distribution of surplus and for the determination of any amount apportioned by way of dividend to said policy (if participating)." The provisions of the 1958 and 1959 policies were also incorporated into the later policies, which were issued in March, 1966, and October, 1973. The 1966 and 1973 policies are conversions from family term benefit riders of the 1958 and 1959 policies.

Moreover, the Company's reservation of the power to change the method of distributing its divisible surplus in the applications is consistent with the language of the insurance policies and the by-laws of Sun Life. Each of the policies provides that "the Company will ... allot as a dividend such amount *as may be apportioned* to the policy by the Company from that portion of the Company's surplus distributed by the Company" (emphasis added). Sun Life's

discretion to alter the method of distributing its surplus is also reflected in the following by-law:

> The Board of Directors, if it shall deem it for the interest of the company[,] may return to the holders of policies ... such part or parts of the actual realized surplus of the Company, in such parts, shares and proportions, and at such times and in such manner as it may deem advisable.

It is well established under Indiana law that a policyholder of a mutual insurance company is bound by those by-laws of the company which are not inconsistent with the provisions of the insurance policy. *Brashears v. Perry County Farmers Protective Ins. Co.,* 51 Ind.App. 8, 98 N.E. 889, 890 (1912).

Taking the applications, policies, and by-laws of Sun Life as a whole, it is clear that Dryden can prove no set of facts in support of his breach of contract claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). A review of the provisions of the contract between Dryden and Sun Life demonstrates that by imposing Operation Equity's method of apportioning Sun Life's divisible surplus, Sun Life and its directors did not breach any contractual obligation owed to Dryden. Rather, Sun Life simply exercised its contractual discretion to apportion the company's divisible premium surplus to each policyholder only to the extent to which that policyholder had actually contributed to the surplus. Therefore, Dryden's claim for breach of contract must be dismissed pursuant to Rule 12(b)(6), F.R.Civ.P.

## V. Fraud

In Count VI of his Third Amended Complaint, Dryden alleges that Sun Life made material omissions and misrepresentations of fact regarding the effect which Operation Equity would have on his life insurance policies. Under Indiana law, the essential elements of fraud are "[1] a material misrepresentation [2] of past or existing facts [3] which misrepresentations are false, [4] made with knowledge or reckless ignorance of this falsity, [5] which cause

reliance to the detriment of the person so relying." *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1410 (7th Cir.1986), *cert. denied*, 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987); *Whiteco Properties v. Thielbar*, 467 N.E.2d 433, 437 (Ind.App. 1984).

In Count VI, Dryden states that Sun Life's omissions and misrepresentations constituting fraud are fully set forth in Count III of his complaint. Under Count III, Dryden sets out nine substantive allegations of fraud under ¶ 50 which state that Sun Life:

(a) omitted to explain the extent of financial damage accruing to policy holders as a result of the pre-Operation Equity practice of treating borrowers and nonborrowers the same with regard to dividends;

(b) omitted to state in the Operation Equity literature that Sun Life could eliminate the promised increased dividends in its discretion at any time;

(c) omitted to inform policyholders of Sun Life's investment philosophy to be applied to investment funds generated by Operation Equity;

(d) omitted to state the dividend determination techniques to be used to produce higher dividends under Operation Equity;

(e) omitted to explain the ongoing price structure of each insurance policy;

(f) omitted to state the facts which would appear in an S.E.C. registration statement;

(g) misrepresented that Operation Equity was meant to increase dividends when its real purpose was to discourage policyholders from borrowing against their policies;

(h) misrepresented that all policies would become more valuable under Operation Equity when in fact only the new policies were more valuable, since older policyholders were penalized for relying on promises in their policies;

(i) and made untrue statements that the value of plaintiff's participating policies "would stack up against any other insurance policy, old or new."

Plaintiff's claim for fraud must be dismissed under Rule 12(b)(6), F.R.Civ.P., for failure to state a claim on which relief can be granted. Dryden's fraud count is defective for three reasons. First, allegations (c) and (f) fail to state a claim for fraud because Dryden's insurance policies were not securities; thus, Sun Life was under no obligation to disclose the information allegedly withheld from its policyholders. Second, allegations (b), (d), (e), (g), and (h) fail to state a claim for fraud because they are refuted by documents attached to, or otherwise incorporated by, Dryden's complaint. Third, the sole remaining charges, allegations (a) and (i), fail to state a claim for fraud because Dryden is unable to allege the essential element of detrimental reliance.

*A. Sun Life policies are not securities*

Turning to the first defect, as noted earlier, the insurance policies Dryden purchased from Sun Life are not securities even after Operation Equity. Therefore, allegations (c) and (f) fail to state a claim for fraud because Sun Life was under no duty to disclose its investment philosophy or to file an S.E.C. registration statement. Accordingly, allegations (c) and (f) must be dismissed under Rule 12(b)(6).

*B. Exhibits refute allegations of fraud*

As to the second defect, it is well established that material which is attached to, or incorporated by reference in, the plaintiff's complaint may be considered by the Court on a motion to dismiss under Rule 12(b)(6). *Griswold v. E.F. Hutton*, 622 F.Supp. 1397, 1402 (N.D.Ill.1985). On a motion to dismiss, the Court must accept as true the allegations of fact in the complaint and construe any reasonable inferences which can be drawn in favor of the plaintiff.

However, when the allegations of the complaint are clearly refuted by an attached document, the Court need not accept conflicting allegations of the complaint as true and may dismiss the claim. *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir.1974) (Wisdom, J.);

*Olpin v. Ideal National Ins. Co.*, 419 F.2d 1250, 1255 (10th Cir.1969), *cert. denied*, 397 U.S. 1074, 90 S.Ct. 1522, 25 L.Ed.2d 809 (1970); *Foshee v. Daoust Construction Co.*, 185 F.2d 23, 25 (7th Cir.1950). As Judge Wisdom observed in the following passage from *Associated Builders:*

> Conclusory allegations and unwarranted deductions of fact are not admitted as true especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document, to be treated as a part of the complaint for all purposes under Rule 10(c), F.R.Civ.P., reveals facts which foreclose recovery as a matter of law, dismissal is appropriate. *Associated Builders*, 505 F.2d at 100 (citations omitted).

In *Associated Builders*, plaintiff's claim for fraud alleged that a disclosure document sent to prospective investors failed to inform them that the bonds could be redeemed prior to November, 1975. *Id.* at 98. After reviewing the detailed and unambiguous explanation in the prospectus that bonds could be redeemed prior to 1975 by operation of the sinking fund, the Fifth Circuit dismissed the fraud claim, stating that "purchasers of the bonds cannot make a good faith argument that the prospectus omits the material facts pertaining to those provisions." *Id.* at 101. Thus, the court concluded that the plaintiff could prove no set of facts in support of his claim that a fraudulent misrepresentation or omission had been made regarding the redemption provisions.

Similarly, in the case at hand, the Sun Life policies and Operation Equity materials attached to, and incorporated by, the complaint refute the assertions of fraud stated in allegations (b), (d), (e), (g), and (h) of Dryden's fraud claim.

### (1) The Sun Life policies

■ The Sun Life policies, and materials incorporated therein, refute allegations (b), (d), and (h). For example, in allegation (b), Dryden asserts that Sun Life omitted to state in the Operation Equity memorandum that promised increases in dividends could be eliminated at any time at Sun Life's sole discretion. However, as noted above under the breach of contract claim, the insurance applications and policies reserved to Sun Life the power to alter the method of distributing the company's surplus to its policyholders. Thus, Dryden and the other policyholders were in fact informed of Sun Life's discretion to alter the payment of dividends at all times.

■ In like fashion, this reservation of the discretion to alter dividends by Sun Life refutes allegation (h). Allegation (h) states in substance that older policyholders were penalized by relying on promises contained in their policies that they would receive a certain level of dividends. In fact, as has been noted previously, the policies contained no such promise; instead, they expressly reserved to the Board the power to alter the allotment of dividends in its discretion.

■ Finally, allegation (e), which asserts that Sun Life failed to inform Dryden of the ongoing price structure of his life insurance policies, is also at odds with the attached policies. Indeed, the premium for each policy was fixed at the time of purchase, recorded on the policy, and remained unchanged. There is no other information regarding price structure which Sun Life could have provided. Thus, allegations (b), (e), and (h) must be dismissed under Rule 12(b)(6) because when they are compared with the exhibits, its is clear that no such misrepresentations or omissions were made.

### (2) The Operation Equity Materials

■ The Operation Equity materials attached to plaintiff's complaint, including the Operation Equity memorandum and the letters sent to Dryden explaining the effect of Operation Equity on each of his policies, refute allegations (d) and (g) of Dryden's fraud claim. For example, in allegation (d), Dryden claims that Sun Life omitted to state the dividend determination techniques that would produce higher dividends to policyholders under Operation Equity.

However, the Operation Equity memorandum clearly explained that dividends

would "directly reflect in each policy the return on any outstanding policy loans." Those policyholders who did not take out loans against their policies enabled Sun Life to invest their premiums at higher market rates and therefore would receive higher premiums. Conversely, since the interest rates on policy loans for older policies were lower than the market rate of return on investments, those policyholders who did take out loans against their policies would receive smaller dividends. It is undisputed that those policyholders who did not borrow against their policies did in fact receive higher dividend payments. Therefore, the Operation Equity materials attached to Dryden's complaint refute allegation (d) of his fraud claim.

■■■ Similarly, the attached Operation Equity materials refute allegation (g) of Dryden's fraud claim, which asserts that Sun Life misrepresented to policyholders that Operation Equity was designed to increase dividends when it was really meant to deter borrowing against whole life policies. When compared to the Operation Equity memorandum, it is clear that Sun Life made no such misrepresentation.

To the contrary, the portions of the Operation Equity memorandum discussed above under allegation (d) expressly informed Dryden that Operation Equity would only increase the dividends of those who did not borrow against their policies. Thus, in its Operation Equity memorandum, Sun Life in no way misrepresented the fact that Operation Equity could also have the incidental effect of discouraging policyholders from borrowing against their policies. Rather, it was clear from the face of the memo that Operation Equity could in fact have this effect. The Court would also add that a mutual company may lawfully discourage its policyholders from borrowing against their policies. *See Trapp v. Metropolitan Life Ins. Co.*, 70 F.2d 976, 980 (8th Cir.), *aff'd on rehearing*, 72 F.2d 374, 375 (8th Cir.), *cert. den.*, 293 U.S. 596, 55 S.Ct. 112, 79 L.Ed. 690 (1934).

Thus, allegations (d) and (g) of Dryden's complaint are refuted by the Operation Equity memo which was attached to, and in-corporated by, the complaint. Hence, to summarize, the policies attached to and incorporated by Dryden's complaint refute allegations (b), (e), and (h) while the Operation Equity materials refute allegations (d) and (g) of Dryden's fraud claim.

### C. Failure to allege detrimental reliance

Finally, turning to the third defect of the complaint, allegations (a) and (i) of the claim for fraud must fail because it appears from the face of the complaint that Dryden is unable to allege the essential element of detrimental reliance. Under the rule of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957), "a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Seglin v. Esau*, 769 F.2d 1274, 1279 (7th Cir.1985). Dryden has failed to set forth the element of detrimental reliance as to allegations (a) and (i).

■■■ Allegation (a) charges that prior to Operation Equity, Sun Life did not explain the damage accruing to policyholders because the company was then using a dividend distribution method which did not take account of outstanding policy loans. Assuming *arguendo* that Sun Life made this omission, it is clear that Dryden could not have relied upon it to his detriment. The pleadings and exhibits show that Dryden had borrowed against his policies at all times relevant to his complaint. Therefore, he could not have been harmed by any reliance on the prior arrangement of distributing Sun Life's surplus; in fact, Dryden clearly benefited from the prior arrangement. Thus, Dryden has failed to allege any detrimental reliance on this alleged omission. Moreover, he lacks standing to raise any such claim of fraud.

■■■ Allegation (i) asserts that Sun Life misrepresented the fact that because of Operation Equity, the value of his participating Sun Life insurance policies would increase relative to other available insurance policies. This allegation relates to the

following statement in the Operation Equity memo:

> We are pleased to announce that Sun Life of Canada is taking policyowner dividends to history-making heights with a new program called Operation Equity. After reviewing the impact of Operation Equity on your dividends, we think you'll agree that your already valuable Sun Life participating policy can become even more valuable, and that its value stacks up against any other insurance policy, old or new.

First, the above quoted language is not a statement of past or existing fact on which Dryden could have reasonably relied. Rather, the above quoted language is at worst a seller's "puff" or "trade talk." *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir.), *cert. den.*, 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987); *Whiteco Properties v. Thielbar*, 467 N.E.2d 433, 437 (Ind.App.1984). As the *Whiteco* court explained, such puffing is "a subjective statement of opinion on which no reasonable purchaser should justifiably rely." *Whiteco*, 467 N.E.2d at 437.

Second, as noted earlier in the Court's discussion of the Operation Equity memo, the Operation Equity materials expressly stated that the predicted increase in dividends would inure only to those policyholders who had not borrowed against their policies. In fact, in Sun Life's letters to Dryden, the company explained to him the extent to which his dividends would be *reduced* on account of Operation Equity. Thus, when the Operation Equity materials are read as a whole, rather than by isolating selected portions, it is clear that Dryden could not have been misled by Sun Life's "puffing" regarding the effects of Operation Equity.

In sum, Dryden could not have justifiably relied to his detriment upon the alleged omission complained of in allegation (a) or the alleged misrepresentation referred to in allegation (i).

In conclusion, allegations (c) and (f) fail to state a claim for fraud because Dryden's insurance policies were not securities. Allegations (b), (d), (e), (g), and (h) fail to state a claim for fraud because they are refuted by documents attached to, or otherwise incorporated by, Dryden's complaint. The sole remaining charges, allegations (a) and (i), fail to state a claim for fraud because Dryden is unable to allege the essential element of detrimental reliance. For these reasons, Dryden's allegations of fraud, set out in his complaint at ¶ 50(a)-(i), must be dismissed for failure to state a claim on which relief may be granted pursuant to Rule 12(b)(6), F.R.Civ.P.

### VI. Class Action and Remaining Matters

Dryden's sole remaining count, Count I, does not attempt to state an action but seeks to have this cause certified as a class action under Rule 23, F.R.Civ.P. Obviously, class action must be denied because of Dryden's failure on the merits to state a claim on which relief may be granted as to his substantive legal claims. The Court would also add that Sun Life's claim that the Court lacks diversity jurisdiction to adjudicate Dryden's complaint because an insufficient amount is in controversy is also mooted by the Court's determination that the pendent state law claims will be dismissed on the merits.

### Conclusion

For the foregoing reasons, Dryden's claims will each be dismissed under Rule 12(b)(6), F.R.Civ.P., because "it appears beyond doubt that [Dryden] can prove no set of facts which would entitle him to relief under any of [his] claims." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957).